Filed 1/22/03 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2003 ND 9

Curtis D. Jundt, Plaintiff, Appellee

 and Cross-Appellant

v.

Jurassic Resources Development, 

North America, L.L.C., a North 

Dakota limited liability company, 

Missouri River Royalty Corp., 

Rainbow Gas Company, Rainbow 

Energy Marketing Corp., Defendants, Appellants

 and Cross-Appellees

and

Loren R. Kopseng, Defendant

No. 20010313

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Robert O. Wefald, Judge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Opinion of the Court by Kapsner, Justice.

Daniel S. Kuntz (argued), Tracy Vigness Kolb (appeared), and James S. Hill (on brief), Zuger, Kirmis & Smith, P.O. Box 1695, Bismarck, N.D. 58502-1695, for plaintiff, appellee and cross-appellant.

Sheldon A. Smith (argued) and Scott K. Porsborg (appeared), Smith Bakke Oppegard Porsborg Wolf, P.O. Box 460, Bismarck, N.D. 58502-0460, for defendants, appellants and cross-appellees.

Jundt v. Jurassic Resources

No. 20010313

Kapsner, Justice.

[¶1] Jurassic Resources Development, North America, L.L.C., a North Dakota limited liability company (“Jurassic”); Missouri River Royalty Corporation (“Missouri River”); Rainbow Gas Company (“Rainbow Gas”); and Rainbow Energy Marketing Corporation (“Rainbow Energy”) appealed a judgment requiring them to cancel Curtis D. Jundt’s membership interest units in Jurassic and pay him $300,000.  Jundt cross-appealed from the judgment; a December 5, 2000, amended order on summary judgment motions; an October 12, 2000, order on a summary judgment motion; and a December 13, 2001, amended memorandum opinion and unchanged findings of fact, conclusions of law, and order for judgment.  We affirm in part, reverse in part, and remand for further proceedings.

[¶2] In 1984, Loren Kopseng and Donald Russell formed Missouri River.  Later, they and others formed a number of other companies, including Rainbow Gas, Rainbow Energy, Montana Heartland, L.L.C. (“Montana Heartland”), and United Energy Corporation, a holding company.

[¶3] Jundt left his position with Williston Basin Interstate Pipeline Company (“WBI”) in 1997 and became an employee of Rainbow Gas.  Jundt and Kopseng formed Jurassic.  The initial members of Jurassic were Missouri River, Rainbow Gas, and Rainbow Energy.

[¶4] Jurassic’s initial operating agreement executed on January 26, 1998, named the following individuals to Jurassic’s Board of Governors: Jundt; Donald Russell, President of Missouri River; Loren Kopseng, President of Rainbow Gas; and Stacy Tschider, President of Rainbow Energy.  Missouri River, Rainbow Gas, and Rainbow Energy invested money in Jurassic, and were issued a total of 10,000 membership units.  Jundt did not invest money in Jurassic and did not, initially, receive any membership units in it.

[¶5] Russell, Kopseng, Tschider, and Jundt executed an after-payout statement of membership interest on January 26, 1998, providing, in part:

Time of Repayment
.  The members will be repaid their contributions at the time the present value of the proven reserves discounted by using the present value discounted at 30%; plus other assets of the company exceed the past capital contributions and any accrued future capital contributions plus interest calculated at the prime rate of BNC Bank of Bismarck.  Jurassic Resources may make dividend payments to pay back the capital contribution amounts plus interest at their discretion anytime Jurassic Resources has the ability to pay dividends.

It also authorized the managing governors to issue Jundt a member certificate for 4,925 membership units (32.833 percent of 15,000 total membership units), as well as 75 units to two other individuals, “after the payout of the capital contributions and interest to Missouri River Royalty Corp., Rainbow Gas Company, and Rainbow Energy Marketing Corp.”

[¶6] Jurassic’s member control agreement, executed on January 26, 1998, provides in part:

3.08 
Additional Capital Contributions
.  No member shall have any obligation to make additional capital contributions to the Company or to fund, advance, or loan monies which may be necessary to pay deficits, if any, incurred by the Company during the term hereof.  Members may make loans to the Company from time to time, as authorized by the Board.  Any payment or transfer accepted by the Company from a Member which is not a capital contribution complying with Section 3.01 shall be deemed a loan and shall neither be treated as a contribution to the capital of the Company for any purpose hereunder, nor entitle such Member (as such) to any increase in such Member’s Percentage Interest.  Any such loan shall be repaid at such times and with such interest (at rates not to exceed the maximum permitted by law) as the Board and the lending Member shall reasonably agree.

ARTICLE IV

TAX MATTERS

4.01 
Tax Characterization and Returns
.  The Members acknowledge that the Company will be treated as a “partnership” for tax purposes.  Within 90 days after the end of each fiscal year, the President will cause to be delivered to each person who was a Member at any time during such fiscal year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Member’s federal or state income tax (or information) returns, including a statement showing each Member’s share of income, gain, or loss and credits for such fiscal year for federal or state income tax purposes.

Jurassic began a program of gas exploration and production.  Differences arose and Jundt left in 1999.

[¶7] Jundt sued to enforce his right to 4,925 membership units of Jurassic, and alleged Kopseng and the corporate defendants breached their obligation of good faith to Jundt and violated their fiduciary duties to Jurassic by, among other things, diverting a business opportunity belonging to Jurassic by acquiring property from WBI for Montana Heartland, which is owned by Jurassic’s corporate members, rather than Jurassic.

[¶8] The trial court found, among other things:

3.  All tax write-offs were by agreement of the parties to go to the money investors in the business venture they mutually agreed to pursue.

4.  Shallow gas leases were acquired and developed into production in Montana through the efforts of the plaintiff and capital and loans contributed by the corporate defendants, as well as the efforts of the defendant Loren R. Kopseng.

5.  The defendants acknowledged the plaintiff was entitled to his 4,925 membership interest units in Jurassic Resources Development North America, L.L.C., a North Dakota Limited Liability Company, effective March 9, 2000.

6.  Concerns about the expenditure of company funds in the fall of 1998 led to action by the Board of Governors on February 22, 1999, which in turn led to the plaintiff’s departure from the company.

7.  The debts of the company exceed the appraisal value determined by the Special Master as of November 27, 2001.

8.  The plaintiff and the defendants no longer have a business relationship that will allow them to work together.

9.  The plaintiff’s efforts in developing the assets of the company have contributed value to the company notwithstanding the debts the company has acquired in the process.

10.  The defendant Loren R. Kopseng has not deliberately acted to oppress the plaintiff in his management or member interest units in the company.

The trial court concluded, among other things:

12.  Through the efforts of the plaintiff and through the capital and loans provided by the corporate defendants, and through the efforts of the defendant Loren R. Kopseng, Jurassic Resources Development North America, L.L.C., a North Dakota Limited Liability Company, has acquired assets and value that are not entirely equitably offset by its debts.

13.  Liquidation and partition are not appropriate equitable remedies in this case.

14.  The plaintiff’s claims against the defendant Loren R. Kopseng are DISMISSED WITH PREJUDICE.

15.  It is equitable for a JUDGMENT to be AWARDED in favor of the PLAINTIFF against the remaining defendants canceling the plaintiff’s membership interest units in Jurassic Resources Development North America, L.L.C., a North Dakota Limited Liability Company, and requiring the remaining defendants to pay the sum of $300,000 to the plaintiff.

The trial court’s judgment dismissed Jundt’s claims against Kopseng and ordered the corporate defendants to cancel Jundt’s membership units in Jurassic and pay him $300,000.

[¶9] The corporate defendants appealed, contending the trial court abused its discretion in awarding Jundt $300,000 as an equitable remedy.  Jundt cross-appealed, contending the trial court improperly granted summary judgment on part of his claim when it determined the defendants did not breach their fiduciary duty to Jurassic when they diverted a business opportunity (the acquisition of oil and gas properties controlled by WBI in the Pine Gas Field) belonging to Jurassic to Montana Heartland, which was owned by all of the corporate Jurassic owners.  Jundt is not an owner of Montana Heartland.

I

[¶10] Jurassic, Missouri River, Rainbow Gas, and Rainbow Energy contend the district court abused its discretion in awarding Jundt $300,000 as an equitable remedy.  “An abuse of discretion by the trial court is never assumed; the burden is on the party seeking relief to affirmatively establish it.”  
Gepner v. Fujicolor Processing, Inc.
, 2001 ND 207, ¶ 13, 637 N.W.2d 681.  “A trial court abuses its discretion only when it acts in an unreasonable, arbitrary, or unconscionable manner, when its decision is not the product of a rational mental process leading to a reasoned decision, or when it misinterprets or misapplies the law.”  
Rose v. United Equitable Ins. Co.
, 2002 ND 148, ¶ 5, 651 N.W.2d 683.

[¶11] The parties stipulated to the appointment of a special master.  The stipulation was formalized in an order drafted by Jundt’s counsel, which appointed the Ryder Scott Company “as a Special Master pursuant to Rule 53, N.D.R.Civ.P., for the purpose of providing fair market value appraisals of” specified assets owned or controlled by Jurassic, Pine Gas Gathering Company, and Montana-Heartland Company.  The order also provided:

The Special Master shall submit its draft report and preliminary appraisals to the parties for comment by November 9, 2001.  The parties may file comments with the Court and Special Master by November 16, 2001 pursuant to Rule 53(f)(5).  The Special Master shall file its final report and appraisals with the Court on November 26, 2001 and serve copies on the parties. . . .  The parties shall advise the Court on November 27, 2001 if they intend to file objections to the Report pursuant to Rule 53(f)(2).  The Court will use the report and appraisals, after considering any objections of the parties, to find the fair market values of any relevant properties to which the parties have not previously agreed to a method of valuation, distribution or liquidation.

[¶12] The defendants contend the parties stipulated they “would be bound by the special master’s findings of the fair market value of Jurassic as of the date of trial.”  The special master found “the Fair Market Value of the reserves and future production and income attributable to certain leasehold interests and the Pine Gas Gathering System of Jurassic ‘et al’ as of November 27, 2001,” was $2,286,000.  The defendants assert “the debt and capital contributions the defendants had in Jurassic at that time totaled $5,568,000,” leaving Jurassic with a negative value.  The trial court awarded Jundt $300,000 for his membership units in Jurassic.  The defendants contend the trial court abused its discretion in awarding Jundt $300,000.

[¶13] The record does not show the parties agreed to “be bound by the special master’s findings of the fair market value.”  The order reflecting the parties’ stipulation says only that the trial court will “use the report and appraisals . . . to find the fair market values of any relevant properties.”  It does not say the court or the parties will adopt or be bound by the special master’s report or findings.

[¶14] The defendants contend the trial court did not apply the clearly erroneous standard required by N.D.R.Civ.P. 53 and there is no evidence establishing the special master’s findings were clearly erroneous.  The trial court’s order appointing the Ryder Scott Company as a special master to provide fair market appraisals of specified properties does not specifically require the special master to make findings of fact or conclusions of law.  The trial court did not specifically adopt or reject the special master’s determination “the Fair Market Value of the reserves and future production and income attributable to certain leasehold interests and the Pine Gas Gathering System of Jurassic ‘et al’ as of November 27, 2001” was $2,286,000.  In its memorandum opinion, the trial court said it “REJECTS the use of the value set by the Ryder Scott appraisal in an equitable resolution of this case.”  In its findings of fact, however, the trial court recognized Jurassic’s debts “exceed the appraisal value determined by the Special Master as of November 27, 2001.”  The trial court also found:  “The plaintiff’s efforts in developing the assets of the company have contributed value to the company notwithstanding the debts the company has acquired in the process.”  The trial court explained in its memorandum opinion:

Notwithstanding the debts owed by Jurassic, the Court finds there to be a significant value to the defendants to retain the ownership of Jurassic free and clear of any interest of Jundt, if for no other reason than they can control the future of Jurassic and the way in which the debts are paid and the assets exploited.  In a worse case scenario of Jurassic ultimately losing money, it will be to the advantage of the defendants for them to be able to control the final “crash” of Jurassic.

An equitable resolution by the Court also takes into account Jundt’s claims about over allocated expenses, attorney fees and transportation charges to the extent the Court has any limited concerns over those claims.  The Court intends through its equitable resolution to end all controversy among the parties so they can all get on with their own endeavors free and clear of any concern about anything anyone is doing with Jurassic.  Fully understanding its equitable resolution is not based on gas reserves, future prices or future costs, and fully understanding it has made no adjustments whatsoever as to the value of Jurassic based on any claims of Jundt, and fully understanding the debts owed by Jurassic to BNC National Bank and the corporate defendants, the Court finds that the equitable resolution of this case is the AWARD OF A JUDGMENT TO JUNDT AGAINST JURASSIC AND THE CORPORATE DEFENDANTS IN THE AMOUNT OF $300,000.  The Court intends through this equitable resolution that no party will be awarded costs and/or attorney fees.

[¶15] The defendants contend “Jundt waived his right to challenge the special master’s determination by failing to provide the special master any evidence he possessed that Jurassic had a higher value.”  They argue Jundt “should not have been allowed to challenge the special master’s findings at trial,” because he did not file “‘objections’ to the report by November 27, 2001.”  However, on November 27, 2001, the first day of trial, the trial court noted the time for objecting was “still running.”

[¶16] Jundt and the defendants told the trial court they wanted to sever their business relationship.  At a motions hearing, one of the defendants’ attorneys told the court: “We don’t want [Jurassic] to be liquidated.  That would cause considerable tax problems for all of the partners here.”  The trial court found the parties “no longer have a business relationship that will allow them to work together” and concluded “[l]iquidation and partition are not appropriate equitable remedies in this case.”  The court concluded cancellation of Jundt’s membership interest units in exchange for payment of $300,000 by the corporate defendants was the appropriate equitable remedy.

[¶17] However, N.D.C.C. § 10-32-119(1) authorizes a court to grant such equitable relief in only limited circumstances:

1. A court may grant any equitable relief it considers just and reasonable in the circumstances or may dissolve, wind up, and terminate a limited liability company:

. In a supervised voluntary winding up and termination pursuant to section 10-32-118;

. In an action by a member when it is established that:

(1) The governors or the persons having the authority otherwise vested in the board of governors are deadlocked in the management of the affairs of the limited liability company and the members are unable to break the deadlock;

(2) The governors or those in control of the limited liability company have acted fraudulently, illegally, or in a manner unfairly prejudicial toward one or more members . . .

(3) The members of the limited liability company are so divided in voting power that . . . they have failed to elect successors to governors whose terms have expired or would have expired upon the election and qualification of their successors;

(4) The limited liability company assets are being misapplied or wasted; or

(5) An event of dissolution has occurred under subdivision a, d, or e of subsection 1 of section 10-32-109 but the limited liability company is not acting to wind up its affairs;

. In an action by a creditor when:

(1) The claim of the creditor has been reduced to judgment and an execution on the judgment has been returned unsatisfied; or

(2) The limited liability company has admitted in writing that the claim of the creditor is due and owing and it is established that the limited liability company is unable to pay its debts in the ordinary course of business; or

. In an action by the attorney general to dissolve the limited liability company in accordance with section 10-32-122 when it is established that a decree of termination is appropriate.

None of the grounds specified in N.D.C.C. § 10-32-119(1) have been established.  Nor have any grounds for ordering a sale of membership interests under N.D.C.C. § 10-32-119(2) been established.  Accordingly, the trial court was without authority to grant equitable relief under N.D.C.C. § 10-32-119.  We, therefore, conclude the trial court abused its discretion in ordering the corporate defendants to pay Jundt $300,000 in exchange for his membership interest units as an equitable remedy.

II

[¶18] Jundt contends the trial court erred in ruling he was not entitled to tax write-

offs flowing from his interest in Jurassic.

[¶19] The trial court found: “All tax write-offs were by agreement of the parties to go to the money investors in the business venture they mutually agreed to pursue.”  The court explained in its memorandum opinion:

Jundt as the owner of 4,925 units of Jurassic since March 9, 2000, (Exhibit 436), claims he should have received (and presumably should continue receiving) about one-third of the tax benefits claimed by the three corporate defendants . . . Jundt refused to provide CPA Nitschke with his tax returns as he refused to provide them to the defendants. . . .  Without Jundt’s personal tax information the impact of this tax benefit cannot be accurately calculated nor can its impact on Jundt’s taxes be determined.  As to this claim Jundt has the burden of proof.  Jundt has failed to carry his burden of proof as what he has offered is far too speculative.

Additionally, both Kopseng and Russell testified that the money investors were to take the tax write-offs as without being able to claim the tax benefits money investors would not invest in such ventures.  The memo Kopseng prepared dated February 10, 1997, (Exhibit 402), to begin this whole process specifically provided in the third full paragraph:

The financial aspects of the corporation are that the silent partners are to put up the money and derive all writeoff’s during the firm’s conception and initial payout period so there will be a before and after payout scenario.  The payoff provision is inserted to guarantee the financial group their writeoff’s during the planned start up period which is scheduled to be conducted as a loss.

Jundt clearly knew and understood all the write-offs would go to the money investors.

[¶20] Jurassic’s Member Control Agreement executed on January 26, 1998, does not provide that the “money investors” were to get all the tax write-offs.  It states, in part:

4.01 
Tax Characterization and Returns
.  The Members acknowledge that the Company will be treated as a “partnership” for tax purposes.  Within 90 days after the end of each fiscal year, the President will cause to be delivered to each person who was a Member at any time during such fiscal year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Member’s federal or state income tax (or information) returns, including a statement showing each Member’s share of income, gain, or loss and credits for such fiscal year for federal or state income tax purposes.

Michael Schmitz, a certified public accountant called as a witness by the defendants, testified that “loss to Mr. Jundt [would] be a passive loss,” which “is suspended until he can use it,” and there is “[n]o limitation on a carry-over.”  He testified on cross-

examination that Jundt was entitled to tax write-offs:

Q.  Mr. Schmitz, if Mr. Jundt was entitled to his membership interest on February 1, 1999, wasn’t he entitled to receive the portion of the tax write-off’s attributable to that interest after that date?

A.  He was entitled to receive them if he was—if he was entitled to the ownership interest, he was entitled to the tax write-offs.  Whether he could use them or not, I don’t know.

. . . .

Q.  (By Mr. Kuntz continuing) The other owners wouldn’t be entitled to take those write-offs after he had earned his interest just because Mr. Jundt couldn’t use them; would they?

A. That’s correct.

[¶21] We conclude the trial court’s finding the parties agreed the money investors were to get all the tax write-offs is clearly erroneous, and the trial court erred in ruling Jundt was not entitled to claim any of the tax write-offs.  The actual amount of the tax write-offs is controlled by Article IV of the Member Control Agreement.

III

[¶22] Jurassic was negotiating to acquire WBI properties before Jundt left Jurassic.  After Jundt left Jurassic, Montana Heartland acquired the properties.  Jundt asserted the defendants breached their fiduciary duty to Jurassic by diverting a Jurassic business opportunity to Montana Heartland, which is owned by the corporate Jurassic owners.  Jundt contends the trial court improperly granted summary judgment dismissing his claim the Jurassic defendants breached their fiduciary duty to Jurassic by diverting a Jurassic business opportunity to Montana Heartland.

[¶23] We recently reiterated the test for resolving a motion for summary judgment:

Summary judgment is a procedural device for promptly and expeditiously disposing of an action without a trial if either party is entitled to judgment as a matter of law and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving factual disputes will not alter the result.  The evidence must be viewed in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the evidence.

Mr. G’s Turtle Mtn. Lodge, Inc. v. Roland Township
, 2002 ND 140, ¶ 21, 651 N.W.2d 625 (citations omitted).  A party opposing summary judgment must present evidence raising an issue of material fact.  
Id.
 at ¶ 22.

[¶24] In granting the defendants’ motion for summary judgment with regard to the Montana Heartland issue, the trial court said:

The defendants’ Motion for Summary Judgment Re: Montana Heartland is GRANTED to the extent the Court finds the WBI leases acquired by Montana Heartland were not a business opportunity that belonged to Jurassic, and thus the value of Jurassic does not include the value of the now developed WBI leases owned by Montana Heartland.

[¶25] This Court has not ruled on the corporate opportunity doctrine.  Section 10-32-

86(1), N.D.C.C., requires a governor of a limited liability company to discharge his or her duties in good faith.  Section 10-32-119(4), N.D.C.C., provides “all members in a closely held limited liability company owe one another” a duty “to act in an honest, fair, and reasonable manner in the operation of the limited liability company.”  “[T]he fiduciary obligation of undivided loyalty imposed upon directors and officers precludes them from appropriating a business opportunity which belongs to the corporation.”  Joseph W. Bishop, Jr., 
The Law of Corporate Officers and Directors
 § 3.05 (2002).  “The law has long recognized the doctrine of corporate opportunity which prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence.”  3 
Fletcher Cyc. Corps.
 § 861.10 (2002 Rev. Perm. Ed.).

[¶26] As the reporter’s note to American Law Institute, 
Principles of Corporate Governance: Analysis and Recommendations
 § 5.05 (1994) states, in part:

1.  The cases and commentators generally recognize the existence of a rule or doctrine of corporate opportunity, although there is confusion as to the manner in which it is to be applied. . . .

2.  The cases offer varying bases for determining whether the corporate opportunity doctrine will be deemed applicable to a given factual situation.

. . . .

8.  The cases offer a variety of justifications for a corporation’s  rejection of an opportunity, including the corporation’s financial inability to take the opportunity.

“What constitutes the usurpation of a corporate ‘opportunity’ is the subject of considerable litigation. . . .  [H]owever, a single definitive test has not yet emerged.”  Joseph W. Bishop, Jr., 
The Law of Corporate Officers and Directors
 § 3.05 (2002).   Four tests have been established as standards for identifying a corporate opportunity: the “line of business” test, the “interest or expectancy” test, the “fairness” test, and the “ALI” test.  Under any test, a corporate opportunity exists when a proposed activity is reasonably incident to the corporation’s present or prospective business and is one in which the corporation has the capacity to engage.  Whether or not a given opportunity meets the requisite relationship is largely a question of fact to be determined from the objective facts and surrounding circumstances existing at the time the opportunity arises.  Whether or not an officer has misappropriated a corporate opportunity does not depend on any single factor.

3 
Fletcher Cyc. Corps.
 § 861.10 (2002 Rev. Perm. Ed.).  “[A] director is not required to use his or her own money or credit to finance the business of the company.”  
Id.
 at § 862.10.

[¶27] The circumstances presented in this case do not provide a basis for determining which of the tests for determining if there has been a usurpation of a corporate opportunity may most appropriately be adopted in this jurisdiction.  Under any of the theories, Jundt has failed to meet his burden.  Jundt, the only individual or entity claiming diversion of a Jurassic corporate opportunity, owns fewer than one-third of the membership interest units in Jurassic.  The corporate defendants own two-thirds of the membership interest units.  Under paragraphs 1.11 and 2.09 of the Jurassic Operating Agreement, the members and the board of governors may take actions by the affirmative vote of a majority of the members or governors unless “otherwise required by law or specified in the Articles of Organization of the Company or a member control agreement.”  Thus, the corporate defendants had the power to control Jurassic’s business decisions.  The managing governors of Jurassic that were representing the corporate owners of Jurassic membership interest units and owned Montana Heartland knew Jurassic was negotiating to acquire WBI properties before Jundt left Jurassic, and, therefore, knew of the opportunity.  The majority owners impliedly disclosed to themselves and to Jurassic all of the relevant facts about Jurassic’s asserted corporate opportunity to purchase WBI properties and elected to forego the opportunity.  Such implied disclosure and consent to Montana Heartland’s acquisition is a permissible inference.  
See
 
Lussier v. Mau-Van Dev., Inc.
, 667 P.2d 804, 813 (Haw. Ct. App. 1983) (Where company president disclosed opportunity to purchase property to shareholders, company was financially incapable of making the purchase, shareholders failed to object to president’s purchase of the property, “[t]he only reasonable inference from such facts is an implied consent by the shareholders.”).  Financial inability justifies a corporation in rejecting an opportunity.  
A.C. Petters Co., Inc. v. St. Cloud Enters., Inc.
, 222 N.W.2d 83, 86 (Minn. 1974).  The defendants here asserted Jurassic lacked the financial ability to take advantage of the opportunity.  There is evidence supporting the court’s finding that Jurassic’s debts exceeded the appraised value of its assets.  Jundt made no showing Jurassic had the financial ability to take the opportunity without additional investment of money or credit by the owners.  There was no showing of a corporate opportunity Jurassic had the financial ability to pursue.  We conclude the trial court did not err in granting summary judgment dismissing Jundt’s claim the defendants diverted a Jurassic business opportunity to Montana Heartland.

[¶28] The judgment is reversed to the extent it ordered cancellation of Jundt’s membership interest units in Jurassic, ordered payment of $300,000 to Jundt, and denied Jundt’s claim to tax write-offs.  The judgment and orders appealed from are otherwise affirmed.  The matter is remanded for further proceedings in accordance with this opinion.

[¶29] Carol Ronning Kapsner

Mary Muehlen Maring

Dale V. Sandstrom

James M. Bekken, D.J.

William A. Neumann, Acting C.J.

[¶30] The Honorable James M. Bekken, D.J., sitting in place of VandeWalle, C.J., disqualified.