### Jasper, et al. v. Appalachian Gas Co., et al.

(Decided February 6, 1913.)

#### Appeal from Fayette Circuit Court.

Corporations—Officers and Agents—Rights, Duties and Liabilities as to Corporation.—An officer of a corporation, charged with the management and conduct of its affairs, owes to it the duty, not only to conduct, promote and safeguard its interests, but also to refrain from doing anything that would injuriously affect it, or deprive it of profits which his skill and ability might enable it to make in the fair and legitimate exercise of its powers. But, where the corporation is insolvent, practically defunct, and incapable of carrying out the purposes of its organization, its officers and directors are not required to account to it for profits realized by them in the exercise of their skill and judgment in rivalry with

the corporate purposes, unless, at the time of the advantageous transaction, they were acting for the corporation and not for themselves.

FORMAN & FORMAN, STOLL & BUSH, L. A. WEST, SMITH & SMITH, J. TEVIS COBB and H. C. RICE, for appellants.

J. T. SHELBY, for appellees.

OPINION OF THE COURT BY JUDGE LASSING.—Affirming.

In July, 1902, there was organized under the laws of South Dakota a corporation, known as the "Appalachian Gas & Oil Company." Its principal place of business was Pierre, South Dakota, with a charter right to have a business office located in Lexington, Kentucky. It had a capital stock of $200,000, divided into 20,000 shares of ten dollars each. Its corporators were, M. C. Alford of Lexington, Ky., H. C. Jasper of Richmond, Ky., and L. L. Stevens of Pierre, South Dakota. Shortly after its organization, John R. Allen, M. C. Alford, C. P. Chenault, J. H. Hazelrigg, Desha Breckinridge, John B. Chenault, F. A. Bullock, H. C. Jasper and J. K. Worrell, each subscribed for three shares of the capital stock of said company, and proceeded to reorganize by electing John R. Allen, F. A. Bullock, J. H. Hazelrigg, C. P. Chenault, M. C. Alford, John B. Chenault, Desha Breckinridge and W. R. Letcher directors of said company. Immediately after the election of the board of directors, H. C. Jasper, J. K. Worrell and W. R. Letcher submitted to the corporation the following proposition:
"Gentlemen:

"We hereby offer to sell, transfer and assign to your company the following named oil leases aggregating about 8,000 acres located in Estill County, Kentucky, on the waters of White Oak and other creeks. A full detailed list of which is hereto attached as part hereof and subject to examination as to title, etc.

"You to issue us in payment therefor the entire capital stock of the company, to-wit: twenty thousand (20,000) shares of the par value of ten ($10.00) dollars, of which sum we will donate to the treasury for development purposes twenty-five hundred shares and twenty-five hundred shares for leases of lands."

This proposition was accepted by the company, and in November following, a large tract of land, in fee, and oil and gas leases in other lands in Estill county, Kentucky, were transferred by deed of J. K. Worrell, H.

C. Jasper, and W. R. Letcher, to the said Appalachian Gas & Oil Company. The consideration for this conveyance was stated as $2,400 and other valuable considerations, viz, the entire capital stock of the Appalachian Gas & Oil Company. After the company was thus organized and possessed of the land and mineral leases in Estill county, Kentucky, negotiations were opened up with one J. R. B. Streator, who, for himself and certain of his friends residing in Pennsylvania, sought to acquire an interest in the Appalachian Gas & Oil Company. After investigation, Streator and his associates purchased, for $5,000, a half interest in the property of said company. This money was paid to John R. Allen on April 9, 1903. After Streator and his associates became interested in the company, it was thought advisable to surrender the South Dakota charter and incorporate under the laws of this State; and in December, 1903, this was done. The name of the new corporation was the Appalachian Gas Company, and all of the property and effects of the Appalachian Gas & Oil Company were transferred to the new company. The directors of the new company were John R. Allen, M. C. Alford, J. H. Hazlerigg, William Christman, J. T. Hemphill, J. R. B. Streator and W. R. Letcher, Jr. The board of directors organized immediately after the election on December 26, 1903 and elected John R. Allen president.

On March 23, 1903, the board of councilmen of the city of Lexington passed an ordinance giving to J. H. Hazelrigg, M. C. Alford, Desha Breckinridge, and their associates, the right to sell natural gas in the city of Lexington under certain conditions and limitations. Section one of said ordinance is as follows:

"That the right, privilege and permission is hereby granted to J. H. Hazelrigg, M. C. Alford, Desha Breckinridge, their associates and assigns, to construct, lay, operate and maintain through and in the streets, avenues, alleys and public places of the city of Lexington a system of pipes for the conveyance, distribution and sale of natural gas for heating, fuel, illuminating, manufacturing and power purposes."

By another section, it was provided that the work of laying mains, etc., for the distribution of natural gas in the city should be completed by the 1st of July, 1904. The time for the completion of this work was extended

by ordinance until July 1, 1907.  On September 7, 1905, the general council of the city of Lexington passed an ordinance authorizing the mayor to advertise for sale a franchise to lay, operate, and maintain pipes in the streets of the city of Lexington for the conveyance, distribution and sale of natural gas; and, in pursuance of said ordinance, which was approved September 12, 1905, and became effective September 20, 1905, a franchise for such purpose was offered for sale on September 25, 1905, when and where John R. Allen became the purchaser for $261.00.  The sale was reported to council as having been made to him and was confirmed. Thereafter this franchise was transferred by Allen to the Central Kentucky Natural Gas Company for $90,000 of the capital stock of said company.  While the sale was made to Allen individually, it appears that certain others were interested with him in it, and the $90,000 of stock received by him was apportioned by him among the real parties in interest.  When Streator and his associates, in May, 1903, acquired an interest in the Appalachian Gas & Oil Company, the following agreement was entered into:

"M. C. Alford, John R. Allen, J. H. Hazlerigg, and their associates, all of Kentucky, of the one part, and J. R. B. Streator and his associates, of Pennsylvania of the other part, agree as follows:

"First parties own in its entirety the capital stock, franchises, etc., of the Appalachian Gas & Oil Company, a corporation having a capital stock of two hundred thousand ($200,000.00) dollars divided into twenty thousand shares of the par value of ten ($10.00) dollars per share, and being desirous of associating with themselves the second parties on account of their experience in the oil and gas business, and their ability to command necessary capital;

"Now hereby sell and transfer to said second parties a half interest in and to said capital stock, properties and rights of the said oil and gas company, making said second parties equal owners of the stock, properties, etc., of said company, and second parties are to have equal voice in the directory and management of said company.

"Said first parties also own the franchise or right to the use of natural gas for heat, light and power in the city of Lexington, Kentucky, and contemplate getting

the similar right in the city of Richmond, and these rights are also to be transferred to the said company. The said rights are to revert to the present owners if no substantial development and exercise of same are made within one year from this date.

"In consideration of the foregoing the second parties are to pay said Alford and his Lexington and Frankfort associates, who have expended said sum, the sum of five thousand ($5,000.00) dollars.

"It is further agreed that the first and second parties are to place in the treasury fifteen hundred dollars at once to meet expenses of the first well and at once organize said company so that all business of the Company can be properly attended to.

"John R. Allen and Associates,

"J. R. B. Streator and Associates."

Conceiving that under this arrangement, any franchise for the sale of natural gas in the city of Lexington that was acquired by Allen and his associates, was for the benefit of Appalachian Gas Company, the successor of the Appalachian Gas & Oil Company, H. C. Jasper demanded of Allen and his associates that the stock in the Central Kentucky Natural Gas Company, which they had received for the franchise bought by them in 1905, be turned over by them to the Appalachian Gas Company. This, Allen and his associates declined to do; thereupon H. C. Jasper and J. K. Worrell sought to have the board of directors of the Appalachian Gas Company institute suit against Allen and others to compel them to surrender said stock, but the board declined to act, and he, in his individual capacity and as a stockholder in the Appalachian Gas Company, brought suit, and several other stockholders in said company joined him. They sought to compel Allen and his associates to turn over the stock, which they had received in the Central Kentucky Natural Gas Company; also the $5,000 which they had received from the Pennsylvania interests in 1903; and for an accounting as to the way and manner in which certain money had been expended in the development of the gas fields in Estill county. The defendants answered. As to the $5,000, they claimed that, under the very terms of the contract, it was to be used in refunding to certain directors money which they had advanced for the company; and that neither the Appalachian Gas & Oil Company nor the Appalachian Gas

Company, as its successor, was entitled to any part thereof. As counsel for plaintiffs now concede the correctness of this proposition, this branch of the case will not be further noticed. Answering the demand of plaintiffs that they surrender the stock which they had received in the Central Kentucky Natural Gas Company, for the franchise which they purchased at public sale in 1905, the defendants stated that, in the purchase of same, they acted for themselves and not in any wise for the Appalachian Gas Company; that the Appalachian Gas Company had no interest whatever in said purchase so made by Allen and his associates; that, at that time, the Appalachian Gas Company had failed and was not an active, going concern; that it was bankrupt; that not only had all of its money been spent, and its credit exhausted, but that the individual stockholders and directors, who had, for a time, supplied money to meet the expenses of the company in drilling and exploitations in the gas fields of Estill county, had refused to lend to the company further assistance or credit; that, while its affairs had not, in fact, been wound up, it was nevertheless a dead corporation; that it had failed in its efforts to find gas in Estill county; and that when they bought in the franchise at public sale in 1905, believing that the Appalachian Gas Company although not dissolved was a dead corporation, they were not attempting to act for it. For the plaintiffs it was urged that, under its charter provisions, the Appalachian Gas Company was authorized to deal in, buy and sell, franchises for natural gas; and that, although it had at that time failed to discover natural gas in its properties in paying quantities, still, being empowered to deal in franchises, it had a perfect right to buy this franchise when offered for sale; and that when the president of the company did buy same, his purchase inured to its benefit. Quite a volume of testimony was taken, exposing in detail all of the transactions of this corporation from its inception over a period down to 1907, or two years after the sale of this franchise, the purchase of which is alleged to inure to the benefit of the Appalachian Gas Company. While the record is large, the question is a narrow one. Did this purchase by Allen of the franchise in 1905 inure to the benefit of the Appalachian Gas Company? The chancellor was of opinion that it did not; that plain-

tiffs were not entitled to the relief sought; and dismissed their petition. They appeal.

The record shows that Allen was the President of the Appalachian Gas Company; that in 1903, he and certain of his associates in Kentucky acquired, through an ordinance passed by the general council of the city of Lexington, the right to use the streets, alleys and ways of said city for the purpose of distributing and selling natural gas; that, at the time the Pennsylvania people became interested in the Appalachian Gas Company, Allen and his associates obligated themselves to transfer to said company, and incorporated in the contract to do so, the following: "The said rights are to revert to the present owners, if no substantial development and exercise of same are made within one year from this date." So, the obligation assumed by Allen and his associates was not to transfer their franchise to the Appalachian Gas Company absolutely and unqualifiedly, but only in the event said company put itself in a position within one year thereafter to exercise said right. That was in 1903. It is not shown or claimed that the Appalachian Gas Company in 1905, when the new franchise was sold, was in a position to exercise same; nor indeed was it alleged or shown that in 1907, or at any time, the Appalachian Gas Company was in a condition to exercise such a franchise. This being true, the question arises, were Allen and his associates, who were officers and directors of the Appalachian Gas Company, obliged to give to said company the benefit which accrued to them under their purchase of the franchise from the city in 1905, simply because they were officers and directors, and its charter authorized it to acquire and dispose of franchises and other property, real and personal, for the use of said corporation in the transaction of its said business. The scope, nature, and purpose, of the business for which the Appalachian Gas Company was organized are set out in the third section of its articles of incorporation, which is as follows:

"The nature of the business and purpose of the corporation is the drilling and sinking of wells in the earth at Estill county, Kentucky, and other counties of said state for the purpose of obtaining from the earth oils, gases and minerals, or either of them, and piping and transporting same to market, and especially for the purpose of piping natural gas to the cities and towns of this state; the building of tanks for storage and refining

and marketing said oils, gases and minerals; and the laying of pipe lines and the condemnation of lands for such purposes, and the acquiring of franchises and other property, real and personal, for the use of said corporation in the transaction of its said business; the purchasing and selling of leases, covering oil, gas and mineral rights, and gas and oil wells; establishing and operating, buying and selling, pipe lines for carrying oil and gas and any and all other things necessary to promote the object of said corporation.''

Any of the things mentioned in this section of its articles of incorporation, it might do in the prosecution of its business, but we fail to find in said articles any right, power, or authority on the part of the corporation to engage in the business of buying and selling franchises. Its right to buy a franchise at all is circumscribed and limited to one particular purpose, to-wit: Its use in the transaction of its business. The position of appellant must fail in the absence of an allegation that at the time said franchise was purchased by Allen and his associates in 1905 it was needed by the Appalachian Gas Company in the prosecution of its business. The record shows that this allegation was not made, for the reason that it could not be, for said company at that time had failed to find gas upon its properties and was insolvent and wholly unable to procure it elsewhere, and hence not in a position to use said franchise in its business. If it be conceded that the contract entered into by Allen and his associates in 1903, by which they agreed to transfer to the Appalachian Gas Company their right to operate a natural gas system within the city of Lexington, provided it was exercised within one year, was still in force at the date upon which this franchise was sold in September, 1905, the company would be in no position to demand an assignment of said purchase of the franchise to it, unless it could show that it was in a position to exercise it. Counsel for appellees concede that if at the time this franchise was purchased, Allen being the president of the Appalachian Gas Company, his purchase would necessarily have inured to the benefit of said company provided it had been in a condition to exercise it, that is, being a going concern, possessing natural gas, and capable of transporting it to Lexington for sale and distribution. This company having been organized for the purpose of supplying Lexington with

natural gas, its president should not, and would not have been permitted to do anything that would, in any wise, tend to defeat the Appalachian Gas Company in the purpose for which it was organized.

As stated by the author in 10 Cyc., 790, ''Directors will not be allowed to assume double relations, dealing for themselves and for the corporation at the same time; but they will be compelled to account to the corporation or to its legal representatives for any secret profits which they may have made by such dealing.''

Appellees concede this to be the law as to going concerns, that is, corporations prosecuting the business for which they were organized; but they contend that this rule has no application to a state of case similar to that presented by the facts in the case at bar. Here the corporation, while still maintaining its corporate existence, had clearly failed in its purposes; not only so, but it was wholly insolvent and, for some time prior to the purchase of the franchise in question, had ceased even in an attempt to actively prosecute its business. We see no good reason why the officers and directors of such a corporation should be denied the right to make advantageous trades for themselves, when, in so doing, the interests of the insolvent, practically defunct, corporation, which they represent, are in no wise prejudiced thereby. It was utterly immaterial to the Appalachian Gas Company who bought the franchise that was sold by the city of Lexington in 1905. It had no money to buy with. None of its stockholders and directors had suggested that it buy a franchise. Indeed, under a contract made with appellees, Allen and others, in 1903, there was no necessity for the company to buy a franchise, if it put itself in a position to exercise same, while the contract was in force; for, it is apparent from the conduct of Allen and his associates in keeping alive the original franchise acquired by them from the city of Lexington in 1903, that they purposed waiving the time limit fixed in their contract for transferring said franchise to the Appalachian Gas Company, and that they intended to make such transfer at any time that said company put itself in a position to exercise it. Their failure to make such transfer was due solely to the fact that the said company was never in a position to use or exercise it.

A critical analysis of the evidence fails to disclose wherein the appellees were recreant, in the slightest de-

gree, in the discharge of any duty owing by them to the Appalachian Gas Company, either as individual stockholders or officers of said company. They made no profit at the expense of the Appalachian Gas Company. It did not own, nor were they obligated to buy for it, the franchise when offered for sale by the city of Lexington in 1905. Not being able to exercise it, its president was under no obligation to refrain from becoming a bidder, when said franchise was offered for sale; and the stockholders of the Appalachian Gas Company, who were associated with him in the purchase of said franchise, in no wise prejudiced the rights of said company. Since the Appalachian Gas Company was not in a position to exercise, and had no money with which to buy, this franchise, appellees are not open to criticism for having bought said franchise for their individual use and profit. The right of officers and directors of a defunct and insolvent corporation to act for themselves was considered and discussed in the case of Hannerty v. Standard Theatre Co., 109 Mo., 297, 19 S. W. 82. There Butler was president and director of the Standard Theatre Company, and his friends and intimate associates constituted a majority of the board of directors of said company. It had leased certain real estate for a term of years, with the right to purchase at the end of five years, by making a stipulated cash payment. It held the property during the five years, but, at the end of that time, was financially unable to make the cash payment and purchase the property. Thereupon, Butler, the president and director, and controlling spirit in the company, purchased the property for himself. The trade turned out to be profitable. There, as here, an effort was made to have him account to the Standard Theatre Company for the profits realized by him in the purchase of this real estate. In denying this right, the court said:

"It is true that directors of a corporation occupy a position of trust and the dealings with the subject matter of the trust will be watched with a jealous eye by the courts. Here, it required $10,000.00 cash to make the purchase under stipulations in the lease. The Company did not have that amount of money nor did it have the credit to raise so large a sum. The option was of no value to the company. Though we treat Mr. Butler as still being president and director of the corporation, still he certainly had a right to buy the reversion in the

property, upon which the corporation held leasehold in-
terest, unless the purchase deprived the corporation of
some rights. As the company could not avail itself of the
option to purchase the property, there can be no valid
objection to the purchase of it by him.''

The reasoning of the court in that case applies with
peculiar force to the facts in the case at bar. The Appa-
l chian Gas Company was in 1905, when this franchise
was sold at public sale, not only without means to buy,
but had no earthly use for said franchise; and, under
such circumstances, it cannot be said that when appellees
became the purchasers thereof, through Allen, they took
any advantage of the Appalachian Gas Company, or
violated any duty which they, as officers and directors
of said company, owed to it. This being true, it would
be manifestly unjust to require them to give to said in-
solvent, practically defunct, corporation the profits real-
ized by them out of said purchase.

The same question arose in Murray v. Vanderbilt, 39
N. Y., 140. There Cornelius Vanderbilt had organized
a transportation company for the purpose of transport-
ing passengers and freight in and to and through Nica-
ragua. After the company had been engaged in business
for some time, it became financially embarrassed and
found that it could not longer carry on the business.
Thereupon, Mr. Vanderbilt, who was then president of
this transportation company, decided to engage in the
business on his own account. There was engaged in the
same business the Pacific Mail Company, and when this
company learned that Mr. Vanderbilt expected to engage
in the business upon his own account, they offered him
a large sum, to be paid in monthly payments, not to do
so. He accepted the offer and did not engage in this
business; and, under his contract with the Pacific Mail
Company, he was alleged to have received more than a
million dollars. Some of the stockholders of the old
company, of which he was president, learning of this
fact, sought to require him to account to the defunct
company for the money which he had received from the
Pacific Mail Company. Upon consideration, the court
denied the relief, basing its opinion upon the idea that
the defendant, Vanderbilt, in obligating himself, for a
consideration, not to engage in the transportation busi-
ness, violated no duty which he owed to the company, of
which he was president, for the reason that, at the time

he did so, the company was so financially embarrassed that it could no longer itself prosecute said business; and this being so, the agreement which he had made could not, by any possibility, have prejudiced his company's rights.

These cases, it seems to us, are rested upon the true principle that, when one accepts a position of trust in the management and conduct of the affairs of a corporation, he owes to said corporation the duty, not only to conduct, promote, and safeguard its interests, but also the further duty of refraining from doing anything whatever that would injuriously affect said corporation, or deprive it of any profits which his skill and ability might properly bring to it, or enable it to make, in the fair and legitimate exercise of its powers. But, when said corporation is insolvent, and, to all purposes, dead and incapable of exercising the function of carrying out the purposes for which it was organized, its officers and directors do not owe it the duty of turning over to it the profits realized by the exercise of their skill and judgment, unless, at the time of the transaction out of which the profit arose, they were acting for said corporate interest and not in their own individual capacity. Here, the corporation was, to all practical intents and purposes, dead. No gas had been found in paying quantities on the properties owned by it. Its resources were exhausted. Its credit gone. It could not have exercised a franchise of the character under consideration. No one knew this better than appellees; and hence, when the franchise was offered for sale in 1905, fully realizing that the enterprise in which they had embarked with their Pennsylvania and Kentucky friends, was an utter failure, they sought to recoup, in a new deal as it were, the losses which they had sustained in the former enterprise. In this particular, it is apparent that they had no idea of giving to the defunct corporation the benefit of any profits that might accrue to them out of this new venture. They acted for themselves alone. Since the Appalachian Gas Company had neither the means with which to buy nor the occasion to use, if it had owned, the franchise in question, we fail to see wherein the stockholders of said company are justified in charging that appellees, in refusing to give to said company the benefits and profits realized by them in the purchase and sale of this franchise, have been recreant in discharging

any duty which they owed to the said Appalachian Gas Company; or, that they enriched themselves at the expense of this company. On the contrary, it is apparent that, throughout the whole history of this case, their conduct has been fair and honorable. They did. everything that they could to make it a success, and, not until it had been thoroughly demonstrated that it was an utter failure, did they enter into negotiations with a different company, which resulted in bringing to them profits, for which they are now asked to account. Under such circumstances, it would be manifestly unjust to require them to surrender to the Appalachian Gas Company the profits thus realized by them.

This view being in accord with that of the chancellor, the judgment is affirmed.