Ann PATMON, Individually; and Ann Patmon, in Her Representative Capacity for American Leasing and Management, LLC, Appellant

v.

Lanier HOBBS, Appellee

NO. 2014-CA-001411-MR

Court of Appeals of Kentucky.

RENDERED: JULY 15, 2016

BRIEFS FOR APPELLANT: Chadwick A. McTighe, Ian T. Ramsey, Louisville, Kentucky

BRIEF FOR APPELLEE: F. Larkin Fore, Louisville, Kentucky

BEFORE: DIXON, D. LAMBERT AND THOMPSON, JUDGES.

## OPINION

THOMPSON, JUDGE:

Ann Patmon, individually and on behalf of American Leasing and Management, LLC, appeals from a judgment of the Jefferson Circuit Court.[1] Patmon argues that the trial court awarded inadequate damages on her claims that Hobbs breached his statutory duties owed as a managing

---

1. American Leasing is now dissolved. For convenience only, throughout this opinion we refer to American Leasing and Patmon collectively as Patmon.

member of American Leasing and Hobbs diverted a business opportunity.

The parties have been in litigation for over a decade. In 2004, a bench trial was conducted to determine the membership interests in American Leasing. The trial court found that Hobbs holds a 51% membership interest in American Leasing, Patmon a 44% interest, and Bruce Gray, who is not party to this appeal, the remaining 5%.

A second bench trial conducted in 2007 concerned Hobbs's violations of statutory and common law fiduciary duties owed to American Leasing. An extensive statement of the facts was given in *Patmon v. Hobbs*, 280 S.W.3d 589 (Ky.App.2009), which we refer to as *Patmon I*. Those same facts are repeated only as necessary to understand the present appeal.

American Leasing is a Kentucky Limited Liability Company (LLC) involved in construction and build-to-suit leases. In early 2004, American Leasing had two existing leases, including one for O'Reilly Auto Parts in Shively, Kentucky. It was also about to begin three additional leases for O'Reilly Auto Parts (O'Reilly leases).

Soon after joining American Leasing as its managing member, in February 2004, Hobbs formed a competing company, American Development & Leasing, LLC. He later sent a letter to Ed Randall at O'Reilly informing him that the O'Reilly leases would be changed to substitute American Development as the landlord for American Leasing. After convincing Randall that as the managing member of American Development Hobbs had authority to make the substitution, the leases were transferred to American Development without consideration paid to American Leasing and without the consent of the remaining disinterested LLC members.

Hobbs later formed another company, Habeeb & Hobbs, LLC, with Steve Habeeb, and that company assumed the leases. By the end of November 2004, American Development served as general contractor for the O'Reilly leases allowing Hobbs to profit from the construction phase as well as the leases. After the construction of the O'Reilly properties was complete, Hobbs sold his and American Development's interests in Habeeb & Hobbs to H&G Management, LLC, a company partially owned by Habeeb, for $110,000.

Patmon filed an action against Hobbs alleging breach of Kentucky Revised Statutes (KRS) 275.170 and common law fiduciary duties for his diversion of the O'Reilly leases to American Development. At a bench trial, evidence was introduced that during his tenure as a managing member of American Leasing, Hobbs received a benefit from when American Leasing paid $7,500 in his personal legal fees, $853 of his personal telephone bill, and $1,527.45 to create an O'Reilly sign for American Development, all without the consent of American Leasing's disinterested members. In addition to damages claimed for Hobbs's diversion of funds from American Leasing, Patmon presented proof as to the value of the leases based on construction income, profits from rental income, and the value of the land purchased with the rental income.

Hobbs defended his actions opining that American Leasing did not have the financial ability to take advantage of the O'Reilly leases. He testified that American Leasing previously had difficulty in paying a U.S. Bank loan for the existing O'Reilly Shively project. He opined that U.S. Bank indicated it would not provide additional financing and the company had inadequate funding for the O'Reilly leases.

Patmon admitted at trial that she did not know how American Leasing would have financed the O'Reilly leases. However, she argued that while American Leasing did not have sufficient cash to finance the leases, U.S. Bank had previously loaned $520,000 to American Leasing for the Shively O'Reilly lease project. Prior to making that loan, U.S. Bank recommended approval of a $3 million credit line to allow American Leasing to develop the O'Reilly leases. The estimated cost for all four leases, including the Shively O'Reilly lease, was less that amount. There was also evidence that Gray, who had considerable assets, and gave his personal guaranty to U.S. Bank could have obtained alternative financing if U.S. Bank declined the loan.

The trial court found that Hobbs had wrongfully taken money from American Leasing and awarded Patmon $18,980.46. However, no damages were awarded for the value of the diverted O'Reilly leases which, Patmon asserted, was derived from the construction income, profits from the rental income, and value of the land purchased through the rental income. The court ruled as follows:

In this case the evidence is clear that ALM did not have the financial ability to undertake the [O'Reilly leases]. In fact, Patmon acknowledged that she did not know whether ALM could have gotten the funding for the leases. Moreover, Habeeb, who ultimately provided the financial backing of the leases, testified he would not have had any involvement with ALM due to Richard D. Pearson's affiliation with the company.[2] Accordingly, Hobbs's dubious conduct with respect to the [O'Reilly leases] did not rise to the level of a diverted opportunity constituting a violation of KRS 275.170.

Patmon appealed resulting in this Court's opinion in *Patmon I*, which affirmed the trial court's findings that Hobbs violated his duties owed to American Leasing under KRS 275.170. *Patmon I*, 280 S.W.3d at 595. KRS 275.170 states in part:

Unless otherwise provided in a written operating agreement:

(1) With respect to any claim for breach of the duty of care, a member or manager shall not be liable, responsible, or accountable in damages or otherwise to the limited liability company or the members of the limited liability company for any action taken or failure to act on behalf of the limited liability company unless the act or omission constitutes wanton or reckless misconduct.

(2) The duty of loyalty applicable to each member and manager shall be to account to the limited liability company and hold as trustee for it any profit or benefit derived by that person without the consent of more than one-half ($\frac{1}{2}$) by number of the disinterested managers, or a majority-in-interest of the members from:

(a) Any transaction connected with the conduct or winding up of the limited liability company; or

(b) Any use by the member or manager of its property, including, but not limited to, confidential or proprietary information of the limited liability company or other matters entrusted to the person as a result of his or her status as manager or member.

The *Patmon I* Court held that unless otherwise provided in a written operating agreement, "a member or manager must account to and hold as a trustee for a limited liability company any profit or benefit derived from the use of company property by that member or manager in-

---

**2.** Pearson was a prior member of American Leasing.

cluding, but not limited to, confidential, proprietary, or other matters entrusted to that person's status as, manager or member." *Patmon I*, 280 S.W.3d at 595. Because there was no dispute that Hobbs did not obtain consent from any member of American Leasing to divert the O'Reilly leases to American Development and the leases qualified as confidential or proprietary information, Hobbs violated his statutory duties. *Id.*

As a matter of first impression, the *Patmon I* Court then considered the application of the doctrine of diverted corporate opportunity in the context of an LLC. *Id.* at 597. The Court held that the fiduciary duties a director owes a corporation with shareholders and those owed by a member of a LLC are the same and, therefore, relied on case law applying the doctrine of corporate opportunity. *Id.* at 596. A new tort emerged in this Commonwealth, the diversion of business opportunity. *Id.* at 597.

A two-part test was adopted for determining whether liability should be imposed on Hobbs for wrongful diversion of a business opportunity as set forth in *Miller v. Miller*, 301 Minn. 207, 224, 222 N.W.2d 71, 81 (Minn.1974). Quoting *Miller*, *Patmon I* held:

> The threshold question to be answered is whether a business opportunity presented is also a 'corporate' opportunity, i.e., whether the business opportunity is of sufficient importance and so closely related to an existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation.

*Patmon I*, 280 S.W.3d at 597. Because there was no dispute that Hobbs diverted a business opportunity of American Leasing for his personal use, the first part of the test was met. Therefore, much of the

focus of *Patmon I* was on the second part of the test and damages.

Relying on *Miller*, *Patmon I* adopted the view that Hobbs cannot be liable for his misconduct unless American Leasing had the financial and legal ability to take advantage of the opportunity. *Id.* at 598. The case was remanded, in part, to permit Patmon the opportunity to present evidence as to whether American Leasing could have taken advantage of the O'Reilly leases. *Id.* *Patmon I* then instructed the trial court as follows:

> Pursuant to KRS 275.170, at a minimum, Hobbs is required to hold in trust all benefits and profits derived by him as the result of his misuse of the build-to-suit leases. In so doing, the court shall determine the value of the build-to-suit leases that Hobbs diverted to American Development[.]
>
> Further, pursuant to KRS 275.290 and KRS 275.300(1)(b), based on Hobbs's misconduct, the court is authorized to order the dissolution of American Leasing. The dissolution of the company will allow American Leasing to conclude its affairs, collect its assets and distribute the assets to its members. In light of Hobbs's misconduct, the court will need to decide, in the interest of justice, the percentage to be used in dividing the assets among the members.

*Id.* at 598–99.

On remand, the trial court entered an opinion and order on September 6, 2012. Regarding Patmon's common-law breach of fiduciary duty and statutory claims, the trial court stated:

> Patmon is entitled to damages for Hobbs's common-law breach of fiduciary duty and failure to follow statutory guidelines of KRS § 275.170. Patmon submitted damages request based on the total contract price of the contracts at

issue, but Patmon is only entitled to the percentage of profits she would have received if the contracts were executed by American Leasing instead of American Development. After the leases were complete, Hobbs sold his interest to a third party for $115,000 minus $25,000 for attorney fees. Hobbs made a total profit of $85,000 on the leases in question. Since Patmon owns 44% of American Leasing, the Court finds that her damages are 44% of $85,000, or $37,400. Accordingly, the Court sets Patmon's damages for Hobbs's common-law breach of fiduciary duty and failure to follow statutory guidelines of KRS § 275.170 at $37,400.[3]

The trial court did not, as instructed in *Patmon I*, make any finding as to whether American Leasing had the financial ability to perform the leases. After Patmon filed a motion to alter, amend or vacate the order, the court granted the motion on September 25, 2012, and awarded an additional $18,980.46 as in its original judgment. Patmon then appealed to this Court.

Patmon's appeal was dismissed as not being from a final and appealable order. *Patmon v. Hobbs*, No. 2012–CA–001814–MR, 2014 WL 97464 (Ky.App.2014) (*Patmon II*). This Court noted that in *Patmon I*, the trial court was instructed to determine whether American Leasing was able to take advantage of the opportunity diverted by Hobbs, which is a "prerequisite to recovery." *Id.* at *1. If the prerequisite was met, *Patmon I* instructed the trial court to determine an adequate remedy. *Id.*

This Court concluded that the trial court had not fully resolved the issues between the parties. It "simply awarded $37,400" and later awarded an additional $18,980.46 for Hobbs's misconduct. *Id.* Concluding

Patmon had not appealed from a final order, this Court stated:

> The value of American Leasing after it has been made whole, the percentage owed to each member upon dissolution, and the amount of damages awarded to Patmon and American Leasing are intertwined. American Leasing's dissolution does not represent a separate claim because the breach impacts the percentage of the members' ownership interests upon dissolution. *See Patmon*, 280 S.W.3d at 599 ("In light of Hobbs's misconduct, the court will need to decide, in the interest of justice, the percentage to be used in dividing the assets among the members."). Before American Leasing is dissolved, and the members' respective ownership interests determined, American Leasing must be made whole. Until American Leasing is made whole and its assets are distributed, Patmon's interests have not been conclusively determined.

*Id.* at *2 (footnote omitted).

Following this Court's dismissal of Patmon's appeal, it came to the attention of the trial court that American Leasing had been administratively dissolved by the Secretary of State on November 2, 2006. Upon learning of American Leasing's dissolution, the trial court assigned 54% of its $2,765.81 in assets to Hobbs and 46% to Patmon. Without making any additional findings, the trial court merely "affirmed and restated" its September 6, 2012, opinion and order as modified on September 25, 2012. This appeal followed.

■ ▇▇▇ The initial question is whether the trial court made sufficient findings of fact and conclusions of law to provide meaningful review. Pursuant to Kentucky Rules of Civil Procedure (CR) 52.01, a trial court is obligated to "find the facts specifi-

---

**3.** The actual figure that Hobbs's interest was sold for was $110,000.

cally and state separately its conclusions of law thereon and render an appropriate judgment[.]" In *Anderson v. Johnson*, 350 S.W.3d 453, 458 (Ky.2011), the Court explained the significance of the trial court's compliance with the rule:

> CR 52.01 requires that the judge engage in at least a good faith effort at fact-finding and that the found facts be included in a written order. Failure to do so allows an appellate court to remand the case for findings, even where the complaining party failed to bring the lack of specific findings to the trial court's attention.

To perform meaningful review of a trial court's decision, this Court must be able to fully understand the facts and evidence upon which the court relied. Without specific findings, this Court "cannot discern the basis of the circuit court's decision and there can be no meaningful review[.]" *Kindred Nursing Centers Ltd. P'ship v. Sloan*, 329 S.W.3d 347, 348 (Ky.App.2010).

■ The same rule applies where a bench trial is conducted and the case remanded for further proceedings, including additional findings of fact. Despite the explicit instructions on remand in *Patmon I* and *Patmon II* and the complexity of the issues, the trial court did not make separate findings of fact or conclusions of law. The missing specific findings of fact include whether American Leasing had the financial ability to undertake the O'Reilly leases and, if so, the value of those leases to American Leasing. As we stated in *Patmon II*, the trial court simply awarded Patmon $37,400. For that reason, we conclude the trial court's order fails to provide sufficient findings of fact and conclusions of law for appellate review and must reverse and remand for a judgment containing specific findings of fact and separate conclusions of law. Nevertheless, we find it helpful to further explain the trial court's task on remand as described in *Patmon I*.

Patmon asserts this Court's opinion in *Patmon I* that placed a burden on Patmon to prove American Leasing's ability to perform the O'Reilly leases is erroneous. Hobbs argues that *Patmon I* is the law-of-the-case and this Court is precluded from reconsidering the view adopted in *Patmon I*. To the extent the doctrine applies, Hobbs is correct.

■ The law-of-the-case doctrine provides:

> When an appellate court decides a question concerning evidence or instructions, the question of law settled by the opinion is final upon a retrial in which the evidence is substantially the same and precludes the reconsideration of the claimed error on a second appeal.

*Siler v. Williford*, 375 S.W.2d 262, 263 (Ky.1964). The doctrine provides for finality and prevents "the drain on judicial resources that would result if previous decisions were routinely subject to reconsideration." *Wright v. Carroll*, 452 S.W.3d 127, 130 (Ky.2014). "A final decision of this Court, whether right or wrong, is the law of the case and is conclusive of the questions therein resolved." *Williamson v. Commonwealth*, 767 S.W.2d 323, 325 (Ky.1989) (quoting *Martin v. Frasure*, 352 S.W.2d 817, 818 (Ky.1961)).

■ There is a rare exception to the law-of-the-case doctrine. It will not be applied when "the former decision [appears] to be clearly and palpably erroneous." *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, 291 S.W.2d 539, 542 (Ky.1956). However, "the mere existence of conflict between the law of the case and other decisions does not guarantee the application of an exception." *Brooks v. Lexington–Fayette Urban County Housing Au-*

*thority*, 244 S.W.3d 747, 753 (Ky.App. 2007).

After examining Kentucky law, in *Ragland v. DiGiuro*, 352 S.W.3d 908, 915 (Ky. App.2010), the Court concluded that "appellate courts hold fast to the law-of-the-case doctrine in the interest of maintaining the integrity of prior appellate rulings." As an example, the Court noted that in *Inman v. Inman*, 648 S.W.2d 847 (Ky.1982), our Supreme Court affirmed a circuit court under the law-of-the-case doctrine despite disagreeing with the prior holding. *Ragland*, 352 S.W.3d at 915. "The Supreme Court in *Inman* determined that a professional degree earned by one spouse should not be considered marital property. Nevertheless, it recognized that it was constrained by the law-of-the-case doctrine despite its ultimate finding that a professional degree should not be considered marital property." *Id.*

Hobbs's argument that *Patmon I* is the law-of-the-case cuts both ways. *Patmon I* and its adoption of the common law doctrine of diversion of business opportunity in the context of an LLC has not gone without criticism. *See, e.g.,* 63 Thomas E. Rutledge & Thomas Earl Geu, *The Analytical Protocol for The Duty of Loyalty Under the Prototype LLC Act*, Ark. L.Rev. 473 (2010). As our Supreme Court confirmed in *Pannell v. Shannon*, 425 S.W.3d 58, 68 (Ky.2014) (quoting *Turner v. Andrew*, 413 S.W.3d 272, 275 (Ky.2013)), "limited liability companies are creatures of statute, controlled by Kentucky Revised Statutes (KRS) Chapter 275." However, under the law-of-the case doctrine, *Patmon I* instructs that the trial court award damages for the diversion of the O'Reilly leases if American Leasing had the financial ability to undertake those leases.

Likewise, the law-of-the-case doctrine precludes Patmon from successfully arguing in this appeal that Hobbs had the burden to prove American Leasing's financial inability to undertake the leases. In the context of corporations, other jurisdictions have rejected the notion that a plaintiff has any burden to prove the corporation was financially able to undertake the diverted opportunity. *See, e.g., Klinicki v. Lundgren*, 67 Or.App. 160, 678 P.2d 1250 (1984). There is some appealing logic to the reasoning that the inability of the corporation to undertake the diverted opportunity as an affirmative defense to be proven by the defendant. *See, e.g., Ostrowski v. Avery*, 243 Conn. 355, 703 A.2d 117 (1997). However, we agree with Hobbs that the law-of-the-case doctrine applies to the holding in *Patmon I* that Patmon had some burden to demonstrate that American Leasing had the financial ability to take advantage of the O'Reilly leases to prevail under the doctrine of diversion of business opportunity.

■ Although we must apply the legal principles pronounced in *Patmon I* to the facts as stated in that opinion, the law-of-the-case doctrine applies only to the extent that an issue was actually resolved. As stated in *H.R. ex rel. Taylor v. Revlett*, 998 S.W.2d 778, 780 (Ky.App.1999), "[t]he crucial requirement is that the appellate court enters a final decision on the question rather than merely commenting on the issue." Although *Patmon I* placed the burden of proof on Patmon on remand to demonstrate American Leasing had the financial ability to perform the O'Reilly leases, *Patmon I* did not address the proof necessary to meet that burden. We now do so.

There is persuasive authority that a "solvent corporation's financial inability to undertake an opportunity does not absolve a corporate fiduciary from liability for diverting what is otherwise a corporate opportunity." *Klinicki*, 67 Or.App. at 164, 678 P.2d at 1253 (citing *W.H. Elliott & Sons*

Co. v. Gotthardt, 305 F.2d 544 (1st Cir. 1962)); *Irving Trust Co. v. Deutsch*, 73 F.2d 121 (2d Cir.1934), *cert. den.* 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1934); *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503 (1939); *Durfee v. Durfee & Canning, Inc.*, 323 Mass. 187, 80 N.E.2d 522 (1948); *Ellzey v. Fyr-Pruf, Inc.*, 376 So.2d 1328 (Miss.1979); *Electronic Development Co. v. Robson*, 148 Neb. 526, 28 N.W.2d 130 (1947); *Foley v. D'Agostino*, 21 A.D.2d 60, 248 N.Y.S.2d 121 (1964)). In addressing whether the financial ability of a corporation to take advantage of an opportunity is relevant where the corporation is not technically or defacto insolvent, the Court in *Klinicki* held it was not. It reasoned as follows:

> To allow a corporate fiduciary to take advantage of a business opportunity when the fiduciary determines the corporation to be unable to avail itself of it would create the worst sort of temptation for the fiduciary to rationalize an inaccurate and self-serving assessment of the corporation's financial ability and thereby compromise the duty of loyalty to the corporation. If a corporate fiduciary's duty of loyalty conflicts with his personal interest, the latter must give way. Unless a corporation is technically or de facto insolvent, a determination whether a business opportunity is corporate or personal does not depend on the corporation's relative financial ability to undertake the opportunity.

*Klinicki*, 67 Or.App. at 165, 678 P.2d at 1253–54 (citations omitted).

In *Ellzey*, 376 So.2d at 1335, the Court adopted the *Miller* two-part test and placed some burden on the plaintiff. However, that burden was met by either proving "the corporation was either (a) not insolvent in the balance sheet sense at the relevant times, or (b) financially disabled as a result of nonpayment of a debt or breach of a fiduciary duty by one or more of the defendants." Expressing a similar view, in *Nicholson v. Evans*, 642 P.2d 727, 731–32 (Utah 1982) (internal citations and quotations omitted), the Utah Supreme Court stated:

> Where the corporation is, in fact, insolvent in the sense that it is defunct as a practical matter, the doctrine of corporate opportunity does not apply and the corporate officials are free to act for their own benefit. But in most jurisdictions, corporate financial difficulty short of actual insolvency as defined above is inadequate by itself to exonerate a fiduciary who appropriates an opportunity. Thus, mere technical insolvency such as the corporation's inability to pay current bills when due or mere inability to secure credit will not absolve a director.

Kentucky cases are in accord with the views expressed in the above-cited cases in that they hold whether a corporate opportunity exists depends on the financial solvency or insolvency of the corporation. *See Jasper v. Appalachian Gas. Co.*, 152 Ky. 68, 153 S.W. 50, 54 (1913) (holding the officers and directors of a corporation may take advantage of a financial opportunity where the corporation was insolvent). In *Urban J. Alexander Co. v. Trinkle*, 311 Ky. 635, 640–41, 224 S.W.2d 923, 926 (1949) (quoting Fletcher, Cyclopedia of the Law of Private Corporations, Section 862.1), it was stated that "[a] business opportunity ceases to be a 'corporate opportunity' and becomes 'personal' when the corporation is definitely no longer able to avail itself of the opportunity."

What can be gleaned from early Kentucky case law is that only insolvency will support a finding that a corporation was financially unable to take advantage of a diverted opportunity. We hold that unless American Leasing was insolvent or legally prevented from performing the

O'Reilly leases, Hobbs must compensate it for his diversion of the O'Reilly leases. The trial court is instructed to make the requisite finding.

The trial court did not make specific findings regarding the amount of damages awarded or whether those damages were based on Patmon's common law claim, statutory claim, or both. The distinction is significant.

■ As to the statutory claim, *Patmon I* instructed that "at a minimum Hobbs is required to hold in trust all benefits and profits derived by him as the result of his misuse of the build-to-suit leases." *Patmon I*, 280 S.W.3d at 598. *Patmon I* instructed that regardless of American Leasing's financial ability to perform the O'Reilly leases, Hobbs's statutory breach of loyalty required that he disgorge himself of all benefits received from his misconduct.[4] The trial court found Hobbs benefited from the diverted O'Reilly leases in the amount of $85,000 representing the purchase price for his interest in Habeeb & Hobbs minus attorney fees and then awarded Patmon $37,400 as her interest in the award based on her ownership in American Leasing. The trial court erred.

First, assuming that the price paid by a company owned by Hobbs's business partner, Habeeb, fairly reflected the value of the O'Reilly leases and was actually the profit gained by Hobbs, there is no authority for deducting the amount Hobbs paid for attorney fees to complete that deal or any other expenses he personally incurred. KRS 275.170 requires that Hobbs completely disgorge himself of any benefits received.

Second, by reducing the award to American Leasing by Hobbs's interest, Hobbs was erroneously permitted to retain the majority of the sale price generated from his misconduct. The damages are recovered by the LLC under KRS 275.170, not the individual members. Under that statute, Hobbs was required to hold *all* the benefit derived from the O'Reilly leases in trust for the LLC. KRS 275.170(2). As indicated in *Patmon I*, "in the interest of justice," the amount of his gain should be divided as an asset of American Leasing and Hobbs's ratio adjusted to reflect his misconduct. *Patmon I*, 280 S.W.3d at 599.

Finally, the trial court did not make a specific finding that $110,000 accurately reflected the benefit Hobbs received from the diverted O'Reilly projects. As noted in *Patmon I*, Hobbs benefited not only from the leases but from the construction phase as well. *Id.* at 592.

For the reasons stated, we must remand this case to the trial court to reconsider the amount of damages awarded for Hobbs's breach of his duties under KRS 275.170. However, although possibly overlapping those damages, Hobbs may be liable for more than merely the profit from the diversion of the O'Reilly leases.

■ As we stated earlier, *Patmon I* recognized a new common law tort in this Commonwealth when it adopted the doctrine of diversion of business opportunity. Therefore, in addition to statutory damages, if the trial court finds on remand that American Leasing was not financially insolvent, the measure of damages is the lost profit the corporation would have received had the opportunity not been diverted. *Stewart v. Ky. Paving Co., Inc.*, 557 S.W.2d 435 (Ky.App.1977). That was the direction given in *Patmon I*. *Patmon I*, 280 S.W.3d at 598–99. The same instruc-

4. KRS 275.170(3) now expressly states "[t]hat a transaction was fair to the limited liability company shall not constitute a defense to the failure to request and receive the required consent of the disinterested managers or members."

tion was given in *Patmon II*, when the trial court was directed to make American Leasing "whole." *Patmon II*, 2014 WL 97464 at *2. As held in *Gomez v. Bicknell*, 302 A.D.2d 107, 114, 756 N.Y.S.2d 209, 214 (2002), an available measure of damages in the case of a diverted corporate opportunity is the calculation of the profit the corporation would have made from the opportunity. The same is true as to Patmon's choice of damages. In other words, the amount of damages is not limited to the profit Hobbs received but to the profit American Leasing would have received had the O'Reilly leases not been diverted by Hobbs.

We conclude by noting that the trial court had the difficult and tedious duty of sifting through the facts and applying the new law set forth in *Patmon I*. Unfortunately, we are simply unable to afford its decision adequate review without further findings of facts and separate conclusions of law. Therefore, we are compelled to remand this case for further findings of fact and an appropriate award of damages. Such damages may include prejudgment interest as permitted under Kentucky law. *See 3D Enterprises Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky.2005).

Based on the foregoing, the judgment of the Jefferson Circuit Court is reversed and the case remanded for further proceedings consistent with this opinion.

ALL CONCUR.

