Ann **PATMON, Individually and in her Representative Capacity for American Leasing and Management, LLC, Appellant,**

v.

Lanier **HOBBS, Appellee.**

No. 2007–CA–002527–MR.

Court of Appeals of Kentucky.

March 27, 2009.

Ian T. Ramsey, Chadwick A. McTighe, Louisville, KY, for appellant.

F. Larkin Fore, Sarah Fore Whittle, Louisville, KY, for appellee.

Before COMBS, Chief Judge; CLAYTON and CAPERTON, Judges.

## OPINION

CLAYTON, Judge.

Ann Patmon (Patmon) individually and on behalf of American Leasing and Management, LLC (American Leasing), appeals from the Jefferson Circuit Court September 24, 2007, judgment wherein the court found that damages could not be awarded for the value of the build-to-suit

lease agreements that Lanier Hobbs (Hobbs) transferred from American Leasing to American Development and Leasing, LLC (American Development). The court determined that, because American Leasing would have been unable to perform the contracts, no corporate "opportunity," as defined under the common law of other states, could exist, thus barring any claim for damages for the build-to-suit leases. Patmon, however, contends that under Kentucky Revised Statutes (KRS) 275.170, certain fiduciary duties are owed by the manager-member to the company and its members, that Hobbs breached these duties, and therefore must compensate American Leasing and/or her for the value of the build-to-suit leases. We affirm in part and in so doing we adopt the doctrine of corporate opportunity, under which one entrusted with active corporate management, such as officer or director or manager-member, occupies fiduciary relationship and may not exploit this position by appropriating a business opportunity properly belonging to the corporation. But we vacate and remand the matter to the trial court for further proceedings consistent with this opinion and its adoption of the doctrine of corporate opportunity.

## FACTUAL BACKGROUND

American Leasing is a Kentucky limited liability company that is involved in construction and build-to-suit lease projects. Generally, American Leasing would purchase land in a predetermined location and then construct a building according to a client's specification. After the building is completed, the client then becomes a long-term tenant under a lease agreement. The build-to-suit leases produce a guaranteed long-term stream of rental income by allowing for the payment of the land purchase through rental income, which ultimately adds real estate assets to a company's (American Leasing's) balance sheet.

In early 2004, American Leasing was working on a $520,000 build-to-lease project for O'Reilly Auto Parts (O'Reilly) in Shively, Kentucky, and a $700,000 strip center construction project for Dr. Raley. Additionally, American Leasing and O'Reilly were in negotiations for three build-to-suit leases (Preston Highway in Louisville; Jeffersonville; and Clarksville, Indiana.) Initially, Hobbs was not an owner/member of American Leasing but worked as a contractor on the O'Reilly Auto Parts store. Hobb's company performed the excavating and concrete work. Through this interaction, he met Richard D. Pearson (Pearson), then the managing member of American Leasing, and began discussions about joining American Leasing. On February 9, 2004, Hobbs and Pearson entered into an Executive/Partnership Agreement wherein Hobbs owned 51 percent, Pearson owned 44 percent, and Bruce Gray (Gray) owned 5 percent. Subsequently, around March 15, 2004, Hobbs and Pearson signed a "Consent Resolution and Agreement," which recognized that Hobbs was a 51–percent owner of American Leasing and the managing member of the Company.

At this time, Hobbs also learned that American Leasing was experiencing difficulty in paying the U.S. Bank loan for the O'Reilly project; therefore, he paid $5,823 to the bank to bring the loan into balance and later signed a personal guaranty on the loan. Following this transaction, Hobbs testified he discovered that American Leasing did not have the financial wherewithal to pursue the three additional O'Reilly projects. Specifically, Hobbs said that U.S. Bank indicated it would provide no additional financing to the company, the company had inadequate funding for other projects, and Hobbs himself did not have the funds to finance these projects.

Patmon's history in this action begins with her work with Hobbs in his excavation and concrete business. Further, in October 2003, Patmon loaned $30,415.16 to American Leasing and Pearson. When Pearson defaulted on the loan, Patmon obtained a default judgment against him on March 1, 2004. Later at a sheriff's sale held on May 5, 2004, Patmon purchased Pearson's membership certificate in American Leasing and became 44–percent owner of the company. Eventually, American Leasing paid Patmon in full for her loan to American Leasing and Pearson.

Meanwhile, Hobbs, on March 3, 2004, formed another company, American Development. He was the sole member of the company. After forming the company, he sent a letter to Ed Randall (Randall) at O'Reilly instructing that the pending Preston, Jeffersonville, and Clarksville leases be changed to reflect American Development as the proposed landlord rather than American Leasing.

In his deposition, Randall stated that, prior to Hobbs's letter, O'Reilly was prepared to enter into three agreements with American Leasing. In fact, Randall said he had never heard of American Development. Randall asked Hobbs to provide evidence to support this request. Hobbs provided the "Consent Resolution and Agreement" between Hobbs and Pearson that showed Hobbs as the managing member of American Leasing with authority to make such a change. The three leases were then transferred to American Development with no consideration paid to American Leasing by Hobbs or his new company. Subsequently, Hobbs and Steve Habeeb (Habeeb) formed another limited liability company which was eventually assigned these leases. The company was started so that Hobbs would provide the leases and Habeeb would obtain the financing for the projects. Habeeb had originally informed Hobbs that he would not be involved in any project with Pearson and was unwilling to finance any American Leasing projects.

Then, notwithstanding that Hobbs knew American Development would be landlord and construction manager for the three projects, he paid the deposits with American Leasing resources. On the same day that Hobbs formed American Development, March 4, 2004, American Leasing paid $2,000 for the Preston project, $100 for the Jeffersonville project, and $5,000 for the Clarksville project. Later, on April 28, 2004, American Leasing paid another $2,000 for the Preston project. In addition, on July 23, 2004, Hobbs used $1,527.46 in American Leasing funds to pay for signage for an American Development project. By the end of November 2004, Habeeb and Hobbs had secured financing for all three projects with American Development serving as the general contractor. This arrangement allowed Hobbs to profit from the construction phase as well as the leases themselves.

## PROCEDURAL BACKGROUND

On November 4, 2004, the first of two bench trials occurred in this case. The trial was held to resolve the membership of American Leasing. On March 31, 2005, the court held that Hobbs, Patmon and Gray[1] were members of the company holding respectively 51 percent, 44 percent, and 5 percent ownership. Furthermore, the court deemed that Hobbs and Gray were owners as of February 9, 2004, denied Pearson's claim of ownership, and found that Patmon became a member on May 5, 2004, when she acquired Pearson's interest.

---

1. Gray is no longer participating in this action, and his claims have been dismissed.

Following the court's first decision, Patmon, in her name and American Leasing's name, sued Hobbs because she had learned that American Leasing's three build-to-suit leases with O'Reilly had been diverted by Hobbs, without membership consent, to American Development. Following the second bench trial, on September 24, 2007, the court held that Hobbs must pay American Leasing $18,980.45, which included $9,100 in down payments to secure land for the build-to-suit leases later completed by American Development; $1,527.45 for signage for these projects; $7,500 for Hobbs's personal legal expenses; and $853 for his personal telephone bill.

The court, however, did not award damages for the value of the build-to-suit lease agreements. Patmon asserted at the trial that the value of these diverted leases is derived from the construction income, profits from the rental income, and value of the land purchased through the rental income. But as to the damages claimed for the statutory breach under KRS 275.170, the court held that because American Leasing was unable to perform the contracts, no "opportunity," as defined under the common law of other states, could exist, thus barring any claim for damages under KRS 275.170. Nonetheless, the court did note that it was unaware of any Kentucky cases specifically addressing diverted opportunity for fiduciary duty purposes.

## ANALYSIS

### 1. Standard of Review

▉▉▉ At a bench trial, the factual findings of the trial court shall not be set aside unless they are clearly erroneous; that is, not supported by substantial evidence. *Cole v. Gilvin*, 59 S.W.3d 468, 472 (Ky.App.2001). If not clearly erroneous, the findings shall not be set aside. Kentucky

Rules of Civil Procedure (CR) 52.01. Additionally, any questions of law that are resolved at trial are reviewed *de novo*. *Gosney v. Glenn*, 163 S.W.3d 894 (Ky.App. 2005).

### 2. Limited Liability Company

▉▉▉ A limited liability company is a hybrid business entity having attributes of both a corporation and a partnership. Its owners are its members. Like corporations and limited partnerships, limited liability companies are creatures of statute. In Kentucky, there is relatively little caselaw regarding limited liability companies and no caselaw concerning fiduciary duties in the limited liability company context. Hence, the parties present this Court with an issue of first impression: whether under KRS 275.170 or by common law, Hobbs owed a fiduciary duty to American Leasing and Patmon.

While Kentucky courts have not directly addressed whether a member of a limited liability company owes a duty of loyalty to fellow members and the company, some jurisdictions have found such a duty. *See Credentials Plus, LLC v. Calderone*, 230 F.Supp.2d 890, 899 (N.D.Ind.2002).

### 3. Duty of loyalty

▉▉▉ The Kentucky Supreme Court described the nature of a fiduciary duty:

> The [fiduciary] relation[ship] may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.

*Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 485 (Ky.1991)(quotation omitted). Further, the Court held that even in the absence of a statutorily imposed duty, an officer or director of a

company owes a fiduciary duty to the company. *Aero Drapery of Kentucky, Inc. v. Engdahl,* 507 S.W.2d 166, 168 (Ky.1974). *Aero* goes further in describing the duty of loyalty:

> [w]henever a reasonably prudent fiduciary is aware of a conflict between his private interest and the corporate interest, he owes the duty of good faith and full disclosure of the circumstances to the corporation.

*Id.* at 169. Regarding partnership and the duty of loyalty, a "partner has a duty to share with the partnership those business opportunities clearly related to the subject of its operations." *See* 59A Am.Jur.2d Partnership § 295 (2003). *See also Van Hooser v. Keenon,* 271 S.W.2d 270, 273 (Ky.1954). For the foregoing reasons, this Court finds that Kentucky limited liability companies, being similar to Kentucky partnerships and corporations, impose a common-law fiduciary duty on their officers and members in the absence of contrary provisions in the limited liability company operating agreement.

 In sum, a breach-of-loyalty claim is based on the existence of a fiduciary duty between a principal and an agent. In general, members of a limited liability company are agents for the purpose of its business or affairs. KRS 275.135(1). But where the articles vest authority in a manager or managers, every manager is an agent of the limited liability company for the purpose of its business or affairs. KRS 275.135(2)(b). Consequently, as the managing member of American Leasing, Hobbs had a duty to act not only in the interests of American Leasing but also owed a basic duty of faithfulness and loyalty to the company. *See Steelvest,* 807 S.W.2d at 483.

 As a result, one who acts as agent for another is not permitted to deal in the subject matter of the agency for his own benefit without the consent of the principal—the other members. Common sense as well as the law dictates that profits realized by an agent in the execution of his agency belong to the other members in the absence of an agreement to the contrary. The duty between principal and agent was discussed in *Stewart v. Kentucky Paving Co., Inc.,* 557 S.W.2d 435 (Ky.App.1977). The agent is bound to a high degree of good faith and is not entitled to avail himself of any advantage that his position may give him to profit at the employer's expense beyond the terms of the employment agreement. *Id* at 437. *Stewart* is particularly illustrative of the duty of loyalty and its breach. The parties therein misappropriated several leads, contract proposals, and contracts, resulting in the jobs being done by the parties' company, not the employer's company. Our Court found that the parties violated their fiduciary duty and upheld the trial court's measure of damages, which was the gross profit that the employer's company would have earned on the contracts. *Id.* at 436–39. Likewise, contrary to his fiduciary duty, Hobbs, who was the manager-partner of American Leasing, formed a competing business and transferred the build-to-suit leases from American Leasing to it. Hobbs's activity posits the question whether Hobbs acted in compliance with his duty of loyalty to the company. This duty is confirmed in the Executive/Partnership Agreement drafted and signed by Hobbs.

### 4. Liability of Members and Managers

The liability of members and managers of limited liability companies is outlined in KRS 275.170. It states that:

> Unless otherwise provided in a written operating agreement:
>
> > (1) A member or manager shall not be liable, responsible, or accountable in damages or otherwise to the limited

liability company or the members of the limited liability company for any action taken or failure to act on behalf of the limited liability company unless the act or omission constitutes wanton or reckless misconduct.

Further explanation is provided by the next subsection, which describes what a member/manager may not do unless more than one-half of the disinterested managers or a majority-in-interest of the members consent:

(2) Each member and manager shall account to the limited liability company and hold as trustee for it any profit or benefit derived by that person without the consent of more than one-half (1/2) by number of the disinterested managers, or a majority-in-interest of the members from:

(a) Any transaction connected with the conduct or winding up of the limited liability company; or

(b) Any use by the member or manager of its property, including, but not limited to, confidential or proprietary information of the limited liability company or other matters entrusted to the person as a result of his status as manager or member.

KRS 275.170(2)(a)(b). To summarize, a member or manager must account to and hold as a trustee for a limited liability company any profit or benefit derived from the use of company property by that member or manager including, but not limited to, confidential, proprietary, or other matters entrusted to that person's status as manager or member. Hobbs concedes and the court found that he never obtained consent from any member of American Leasing to divert O'Reilly leases to American Development. These leases qualify as "confidential or proprietary information."

5. Diverted corporate opportunity

The next step in our analysis is to ascertain, in the absence of clear caselaw and statutory guidance, the duty of loyalty required by a managing member of a limited liability company. In the absence of a Kentucky case delineating the duty of loyalty in a limited liability company and based on the hybrid nature of a limited liability company, we look at an explanation of the duty of loyalty in the partnership context:

Under Kentucky law, partners owe the utmost good faith to each and every other partner. *See Axton v. Kentucky Bottlers Supply Co.*, 159 Ky. 51, 166 S.W. 776, 778 (1914).... Indeed, it has often been said, "there is no relation of trust or confidence known to law that requires of the parties a higher degree of good faith than that of a partnership." *Van Hooser v. Keenon*, 271 S.W.2d 270, 273 (Ky.1954).

*Lach v. Man O'War, LLC*, 256 S.W.3d 563, 569 (Ky.2008).

Therefore, given that partners owe good faith to each other, we believe it follows logically and equitably that a managing member of a limited liability company also owes such a duty to other members (partners). Furthermore, this standard, in combination with KRS 275.170, leads us to the conclusion that Hobbs violated the duty of loyalty, and therefore, breached his fiduciary duty to his fellow members and to the company.

Indeed, in its finding of fact, conclusion of law, the trial court itself concluded:

Kentucky courts have not yet addressed the applicability of fiduciary duties in the limited liability company contest.

... KRS 275.170(2) creates a statutory duty of loyalty for self-interested transactions ...

The Court finds that Hobbs violated the statutory standards in KRS 275.170[.]

But the court limited damages to the actual dollar amount of American Leasing's resources that Hobbs used for himself and for American Development. After awarding damages based only on this amount, the court, in essence, found no violation of KRS 275.170 when Hobbs took the three pending O'Reilly build-to-suit leases for his limited liability company, American Development. Rather than continuing with an analysis of fiduciary duty, the court, without any explanation, moved to a discussion of misappropriation of corporate opportunity. One theory of this doctrine holds that opportunity does not exist for a business if the business is financially unable to undertake the opportunity. Then, while observing that no Kentucky case details diverted opportunity as obviating fiduciary duty, the court cited cases from other jurisdictions explaining this rationale. *See Miller v. Miller*, 301 Minn. 207, 225, 222 N.W.2d 71, 81, 77 ALR 3d 941 (Minn. 1974); *Jundt v. Jurassic Resources Development*, 656 N.W.2d 15, 24 (N.D.2003); and, *In re Sullivan*, 305 B.R. 809, 52 Collier Bankr.Cas 2d 526 (Bkrtcy.W.D.Mich. 2004).

In fact, Hobbs's entire rationale for disputing his liability for taking the leases from American Leasing to American Development is based on the doctrine of misappropriation of corporate opportunity and is based solely on three cases from other jurisdictions. But his analysis is limited. First, he does not discuss the *Miller* two-part test for establishing a *prima facie* case of usurpation of corporate opportunity, which states that the new business opportunity must be "so closely related to the existing or prospective activity of the corporation" that it constitutes a corporate opportunity. *Miller*, 222 N.W.2d at 81. Then Hobbs provides no discussion of

whether he, by acquiring the opportunity, must have violated the duties of loyalty, good faith, and fair dealing toward the corporation. *Id.* Implicit in the use of this doctrine, however, is an acknowledgment that it was a business opportunity of American Leasing and that he violated his duties to the company. We would be remiss to not point out that the *Miller* case involves a discussion based on a corporation rather than a limited liability company. However, we see no difference between the fiduciary duties a director owes a corporation with shareholders or a member owes to a limited liability corporation.

In Kentucky, however, the focus is on the fiduciary's duty-not the lost opportunity. For instance, returning to *Aero,* we find the following cite:

> There are numerous instances where a legitimate conflict of interest exists between a fiduciary and his corporation. Whenever a reasonably prudent fiduciary is aware of a conflict between his private interest and the corporate interest, he owes the duty of good faith and full disclosure of the circumstances to the corporation. "If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all of its stark significance." *Wendt v. Fischer,* 243 N.Y. 439, 154 N.E. 303, 304 (1926).

*Aero,* 507 S.W.2d at 169. Further illustration of this principle is provided by *Urban J. Alexander Co. v. Trinkle,* 311 Ky. 635, 224 S.W.2d 923 (Ky.1949), where the Court held the director was allowed to avail himself personally of an opportunity after making diligent efforts to pursue the opportunity for the company notwithstanding the fact that the company definitely could not have availed itself of the opportunity. *Id.* at 925–27. Hobbs shows no action in this regard other than his opinion that the

company could not have completed the projects. More importantly, he never gives notice to any other member. Nonetheless, the court based its decision on a doctrine from another jurisdiction without explanation of Hobbs's fiduciary responsibility to his fellow members about the company's build-to-suit leases. Even though the court describes Hobbs's conduct as "dubious," it moves directly to the diverted corporate opportunity with no discussion of Hobbs's breach of the duty of loyalty or his actions in light of KRS 275.170.

Based on the court's use of the diversion of corporate opportunity as the basis for its decision, we shall examine Kentucky statutes that codify corporate conflict of interest for directors of a corporation. KRS 271B.8–310(1) states:

A conflict of interest transaction shall be a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction shall not be voidable by the corporation solely because of the director's interest in the transaction if any one (1) of the following is true:

(a) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;

(b) The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

(c) The transaction was fair to the corporation.

Obviously, this statute is referring to directors of corporations rather than manager-members of limited liability, but we believe this statute is illustrative of Kentucky law regarding the primacy of fiduciary duty over misappropriation of corporate opportunity. But in order to concur with the trial court, we must determine not only that Hobbs's activities breached the statutory standards found in KRS 275.170 and KRS 271B.8–310(1), but we also must recognize the doctrine of diverted corporate opportunity. In light of the fact that Kentucky jurisprudence has never addressed this issue of lost opportunity and that this case is one of first impression, we adopt the business opportunity doctrine.

In doing so, however, we rely on the analysis found in *Miller*:

[W]e believe a more helpful approach is to combine the "line of business" test with the "fairness" test and to adopt criteria involving a two-step process for determining the ultimate question of when liability for wrongful appropriation of a corporate opportunity should be imposed. The threshold question to be answered is whether a business opportunity presented is also a "corporate" opportunity, i.e., whether the business opportunity is of sufficient importance and so closely related to an existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation.

*Miller*, 222 N.W.2d at 81. Herein, the trial court has already determined that Hobbs's diversion of the O'Reilly build-to-suit lease projects was indeed a corporate opportunity of American Leasing that he diverted for his own use.

Having adopted the doctrine of corporate opportunity, we must next analyze whether American Leasing had the ability to undertake the O'Reilly project. During the bench trial, Hobbs argued that the three O'Reilly projects required completion by March 1, 2005. Moreover, he

opined that American Leasing would have been unable to acquire the financing for the projects because U.S. Bank would not finance the projects and Habeeb refused to finance any project that involved Pearson. Hobbs posits that for these reasons, he had to form American Development so as not to lose the business prospect. This line of reasoning, however, is disingenuous. First, regardless of the company's ability to complete the projects, Hobbs could have and should have informed the other members. Moreover, notwithstanding the membership dispute, the record is clear that Hobbs knew the players—Pearson, Patmon, and Gray. The record shows no attempt by Hobbs to communicate his actions to the other members, explain his lack of communication to them, or to ask their assistance in obtaining financing for the projects. Further, a possibility exists that American Leasing could have sold its business opportunity to another venture and profited in that manner. At this juncture, it is pure speculation to assume that, even if Hobbs had exercised his duties of loyalty to American Leasing, it could not have completed or sold the leases.

Thus, we believe for the most part, that the court's legal analysis was correct. While it is true that transactions between a limited liability company and its managers are subject to fewer restrictions than are transactions between a corporation and its officers and directors, the transactions are still limited by the managers' obligation of good faith and fair dealing. Accordingly, the primary jurisprudence here is not whether the company could have completed the projects but whether Hobbs breached the statutory requisites found in KRS 275.170 and the common law as delineated in Kentucky. A member or manager must account to and hold as a trustee for the limited liability company any profit or benefit derived from transactions involving the use of a limited liability company's property by that member or manager without the consent of (i) one-half of the disinterested managers, (ii) one-half of the other persons (whether or not members) participating in management or (iii) a majority-in-interest of the members. *See* KRS 275.170(2). Hence, clearly the first prong of the business opportunity doctrine has been met: that is, Hobbs breached his fiduciary duty to American Leasing. After meeting the first prong of the doctrine of corporate opportunity, however, it is still necessary for Patmon to establish that American Leasing had the financial wherewithal to undertake the O'Reilly project. *Miller*, 222 N.W.2d at 81. While we are aware that Patmon opined during the course of the litigation that she did not know how American Leasing would have financed the project, she did so prior to the adoption of this doctrine. Thus, Patmon must now have the opportunity to address the burden of proof as to this issue.

6. Damages

Thus, we remand this case to the trial court to determine a remedy for Hobbs's common-law breach of fiduciary duty and failure to follow the statutory guidelines of KRS 275.170. Pursuant to KRS 275.170, at a minimum, Hobbs is required to hold in trust all benefits and profits derived by him as the result of his misuse of the build-to-suit leases. In so doing, the court shall determine the value of the build-to-suit leases that Hobbs diverted to American Development. We note that typically a breach of fiduciary duty in the partnership context results in an accounting (because profits, assets or opportunities have been diverted), or simply damages (again for the profits lost or losses incurred as a result of the breach.) *Bromberg and Ribstein on Partnership* ¶ 16.07(i) (2005). For instance, the measure of damages in a similar case where company opportunity

was misappropriated was the gross profit a company would have earned on the contracts. *See Kentucky Paving,* 557 S.W.2d at 436–39.

Further, pursuant to KRS 275.290 and KRS 275.300(1)(b), based on Hobbs's misconduct, the court is authorized to order the dissolution of American Leasing. The dissolution of the company will allow American Leasing to conclude its affairs, collect its assets and distribute the assets to its members. In light of Hobbs's misconduct, the court will need to decide, in the interest of justice, the percentage to be used in dividing the assets among the members.

Finally, Patmon will be able to present evidence as to whether American Leasing could have taken advantage of the business opportunity of the O'Reilly build-to-suit leases.

## CONCLUSION

Accordingly, we remand the September 24, 2007, judgment of the Jefferson Circuit Court for additional proceedings consistent with this opinion.

CAPERTON, Judge, concurs.

COMBS, Chief Judge, Concurs and Files Separate Opinion.

COMBS, Chief Judge, concurring.

I concur with the well reasoned majority opinion in this unique and significant case. But I write separately in order to emphasize that this is indeed a case of first impression.

The trial court made numerous calls correctly. Its only error involved filling a hiatus in the law that often may only be decided in the course of an appeal. Short of clairvoyance, which is lacking in most humans, the trial court acted carefully and correctly within the only parameters of the precedent before it.