RENDERED: JULY 2, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0432-MR

JAMES Q. MEREDITH AND
PETRO-FLOW, INC.

APPELLANTS

APPEAL FROM CLAY CIRCUIT COURT
v.      HONORABLE OSCAR GAYLE HOUSE, JUDGE
ACTION NO. 03-CI-00157

MONTICELLO OPERATING CORPORATION;
C.J. GREEN, LLC; AND
RALPH D. MEREDITH

APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; K. THOMPSON AND L. THOMPSON, JUDGES.

CLAYTON, CHIEF JUDGE: James Q. Meredith ("J. Meredith") and Petro-Flow,

a Kentucky corporation ("Petro"), appeal from the Clay Circuit Court's order

involving certain natural gas wells located in Clay County, Kentucky. The trial

court's order adjudicated issues including the distribution of the proceeds from such wells, the allocation of transportation charges, and damages for trespass and improper plugging of the wells. Based on a review of the record and applicable law, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

J. Meredith, both individually and as the president of Petro, entered into a business relationship with Ralph D. Meredith ("R. Meredith"), both individually and as the president of Monticello Operating Corporation, a Michigan corporation ("Monticello"). The business relationship related to the exploration for, and removal of, natural gas located on specific real properties located in Clay County, Kentucky.

In October of 1996, the parties executed a document entitled "Assignment of Oil and Gas Leases" (the "1996 Assignment"). Pursuant to the 1996 Assignment – and retroactively effective to August 1, 1996 – J. Meredith and Petro assigned certain oil and gas leases to Monticello while retaining a thirty percent (30%) "carried working interest" in such wells. Additionally, the 1996 Assignment allowed J. Meredith and Petro a forty-five percent (45%) "working interest" on two (2) separate natural gas wells. Importantly, the parties made a distinction in the 1996 Assignment between a "working interest" and a "carried

working interest." In return, Monticello agreed to perform certain exploratory and production activities on the wells subject to the described leases.

Thereafter, the parties – along with other parties not relevant to this appeal – entered into a new, separate agreement entitled "Stipulation of Interest and Cross Conveyance of Oil and Gas Leases" effective as of July 27, 1998 (the "1998 Agreement"). The 1998 Agreement consolidated ownership in the leases described therein to Petro and Monticello. The 1998 Agreement provided for a specific percentage of a "working interest" to Monticello in certain wells, while the remaining percentage of "working interest" in such wells was allocated to Petro. Thus, the 1998 Agreement did not reserve a carried working interest for either J. Meredith or Petro in the wells made subject to this action, as contrasted to the specific reservation made in the 1996 Assignment.

Additionally, the 1998 Agreement contained a general release of all claims between the parties "which may have accrued as of July 15, 1998 arising out of any oil and gas exploration agreement, assignment, farmout agreement, joint venture agreements, letters of intent or similar document executed previously to July 15, 1998. As they pertain to [the applicable leases] . . . in Clay . . . County, Kentucky only." This clause encompassed the wells made subject to this litigation.

This litigation was initiated by J. Meredith and Petro (referred to collectively herein as the "Plaintiffs" or "Appellants") on May 13, 2003 with the

filing of their complaint against Monticello, C.J. Green, LLC, a Kentucky limited liability company ("Green") to whom Monticello subsequently transferred and assigned its operations, and R. Meredith (collectively referred to herein as the "Defendants" or "Appellees"). Specifically, the Plaintiffs alleged, among other things, that Monticello failed to drill and complete the number of wells specified in the 1996 Assignment, failed to drill the wells in a proper manner, failed to maintain the wells, and placed a compressor on the wells allegedly causing permanent damage to the wells.

The Plaintiffs requested a specific accounting of the monthly production from the applicable wells; that the Defendants be removed as operators of the wells; a judgment in such an amount that was due with respect to their respective working interests under the 1996 Assignment; damages for the Defendants' alleged failure to drill, complete, and maintain the applicable wells; as well as damages for Defendants' use of the compressor. The Plaintiffs also asked for a temporary and permanent injunction to require the removal of the compressor.

On September 22, 2003, the Defendants filed an answer and counterclaim in which they requested a judgment against the Plaintiffs in an amount equal to the Plaintiffs' percentage of the amount of costs for operating the wells.

Ultimately, the Plaintiffs moved the trial court to place all funds generated from the production of the wells made subject to the litigation in an interest-bearing escrow account with the clerk of the trial court, which the court granted on December 16, 2003. Thereafter, the wells at issue were operated by each party under the 1998 Agreement, with both parties using compressors as part of such operations. In August 30, 2004, the trial court designated Petro as the operator of all the applicable wells other than a well described as #K23 ("Well #K23").

The circuit court subsequently conducted a three-day trial in September of 2010 but did not enter an order and judgment until February 26, 2020. During the period both prior to the trial and between the trial and the court's entry of an order and judgment in February of 2020, multiple accountings were filed with the court as part of motions for disbursement from the escrow account handling the proceeds and expenses of the subject wells. The motions dealt with issues such as payment of attorneys' fees, payment of operational expenses, and payment of proceeds to the parties. Disbursements made under these motions were made subject to correction or revision by the trial court pending final accounting. Additionally, at various times throughout the operation of the wells made subject to this action, natural gas was removed, shipped, and sold by the parties.

In its February 2020 order, the trial court found that, based on the evidence, the 1998 Agreement was the controlling document. Thus, the trial court determined that any carried working interest that J. Meredith and/or Petro may have had under the 1996 Agreement terminated with the execution of the 1998 Agreement. Therefore, the trial court found that any claim or payment for a carried working interest on the part of Petro after the date of the 1998 Agreement was improper. The trial court further reviewed the spreadsheets of the escrowed funds provided by the parties, as well as other evidence, and determined that Petro was overpaid in the amount of $173,317.18.

Additionally, the trial court concluded that, because both parties utilized compressors during their operation of the applicable wells, any claims by the Plaintiffs against Monticello for the use of a compressor were without merit. Further, the trial court found that, following its August 30, 2004 order, Petro took certain actions that went beyond regular maintenance and operation of the wells, including unilaterally terminating an existing purchase contract and entering into a new purchase contract with Petro's affiliate, Cimco Energy ("Cimco"); charging transportation fees to the Defendants which were not provided for in the 1998 Agreement and without disclosing that such payments were made to Cimco; and plugging Well #K23, which it did not have court order to operate. The trial court noted that Petro's actions were taken without notice or approval by the trial court.

Ultimately, while the trial court ordered that all future operations of the wells would be conducted by Petro, the trial court awarded Appellees damages in the amount of $213,866.36 for trespass regarding plugging Well #K23, improper distributions from the escrow account to Appellants for carried working interest claims, improperly charged marketing costs, and unpaid costs of well operation. Additionally, the trial court ordered that $135,000.00 be paid to Appellees from Petro's future proceeds from the wells, after which the proportional division from the 1998 Agreement would be reinstated and each party paid accordingly.

This appeal followed. Further facts will be discussed as they become relevant.

## ISSUES

Appellants claim numerous issues on appeal, including (1) whether the trial court erroneously denied Appellants' claims for transportation fees against Appellees; (2) whether the trial court erroneously determined that Petro had trespassed when it plugged Well #K23; (3) whether the trial court erred in awarding $135,000.00 to Monticello from Petro's portion of future well proceeds; (4) whether the trial court erred in finding that Appellants did not have a carried working interest under the 1998 Agreement; and (5) whether the trial court erred in failing to award damages to Appellants based on alleged negligent drilling and/or completion practices by Appellees.

## ANALYSIS

### a.  Preservation of the Plaintiffs' Insufficiency Claims

As a preliminary matter, Appellees argue that Appellants failed to preserve their arguments because they failed to file a motion to alter, amend, or vacate or any other motion for post-judgment relief.  Rather, Appellants' statements of preservation in their brief recite that, "[t]his error is set forth within the Trial Order and Judgment entered by the court and it was not necessary to preserve this issue for review.  Pursuant to CR 76.12(4)(c)(v)."  Appellees argue that the foregoing statement does not sufficiently preserve Appellants' arguments for appeal as required under Kentucky Rules of Civil Procedure (CR) 76.12(4)(c)(v).

In this case, we believe that CR 52.03 ultimately resolves the issue.  The rule states:

> [w]hen findings of fact are made in actions tried by the court without a jury, *the question of the sufficiency of the evidence to support the findings* may thereafter be raised *whether or not the party raising the question* has made in the trial court an objection to such findings or *has made a motion to amend them or a motion for judgment or a motion for a new trial*.

(Emphasis added.)  Therefore, while Appellants could have done significantly more to demonstrate how and why the issues regarding the sufficiency of the

evidence were preserved for appeal, these issues are nonetheless preserved, and we proceed to consideration on the merits.

Other circumstances, however, require motions or objections subsequent to the findings. As stated by the Kentucky Supreme Court in *Eiland v. Ferrell*:

> [i]f the findings are objectionable on grounds other than insufficiency of evidence, an objection or appropriate motion should be made to identify the defect. Such would surely apply where findings are ambiguous or incomplete. In particular, CR 52.04 requires a motion for additional findings of fact when the trial court has failed to make findings on essential issues. Failure to bring such an omission to the attention of the trial court by means of a written request will be fatal to an appeal.

937 S.W.2d 713, 716 (Ky. 1997) (citation omitted). Thus, "[t]he thread which runs through CR 52 is that a trial court must render findings of fact based on the evidence, but no claim will be heard on appeal unless the trial court has made or been requested to make unambiguous findings on all essential issues." *Id*.

Here, Appellants' third argument regarding whether the trial court erred in awarding $135,000.00 to Appellees, while couched in terms of the sufficiency of the evidence, is more an argument that the trial court did not make sufficient findings. For example, Appellants state in their brief that "[n]owhere does the figure of $135,000.00 appear" within the evidence, and question "[d]id the trial court mean to say the $135,000.00 was a return of operating fees charged by

[Appellants]? It is pure conjecture and speculation as to why the trial court employed the amount of $135,000.00." Thus, we decline to address this issue, as "[f]ailure to bring such an omission to the attention of the trial court by means of a written request will be fatal to an appeal." *Eiland*, 937 S.W.2d at 716 (citation omitted).

### b. Sufficiency of the Evidence to Support the Trial Court's Denial of Appellants' Transportation Fees

On appeal, Appellants contends that there was insufficient evidence presented at trial to justify the trial court's denial of transportation fees incurred when Petro, as operator of the wells, transported gas through the pipeline owned by Cimco after August 30, 2004. We first note that, "[a]t a bench trial, the factual findings of the trial court shall not be set aside unless they are clearly erroneous; that is, not supported by substantial evidence." *Patmon v. Hobbs*, 280 S.W.3d 589, 593 (Ky. App. 2009) (citing *Cole v. Gilvin*, 59 S.W.3d 468, 472 (Ky. App. 2001)). "If not clearly erroneous, the findings shall not be set aside." *Id.* (citing CR 52.01). Further, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. In fact, "judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Vinson v. Sorrell*, 136 S.W.3d 465, 470 (Ky. 2004) (quoting *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)). "Additionally, any questions of law that are resolved at trial are reviewed *de novo*." *Patmon*, 280 S.W.3d at 593 (citing

-10-

*Gosney v. Glenn*, 163 S.W.3d 894 (Ky. App. 2005)). With these standards of review in mind, we turn to the trial court's findings of fact and conclusions of law in the present case.

Regarding Appellants' claim for transportation costs, as previously discussed, the parties entered into two separate contracts – the 1996 Assignment and the 1998 Agreement – regarding the wells made subject to this action. In the 1996 Assignment, the parties agreed "that there shall be no charge for such transportation." Conversely, the 1998 Agreement did not discuss transportation costs.

Appellants have provided no evidence that the 1998 Agreement was not the controlling document applicable to the parties' business relationship. Moreover, we agree with the trial court that the 1998 Agreement did not provide for fees of this nature as part of the contract. Additionally, the 1998 Agreement did not state that Appellants had a "carried working interest" in the operation of the wells, which is defined as "a fractional interest in an oil and gas property, usually a lease, *the holder of which has no personal obligation for operating costs*[.]" *Mayfield v. H.B. Oil & Gas*, 1987 OK 106, 745 P.2d 732, 733 n.1 (Okla. 1987) (citation omitted) (emphasis added). Thus, we would be adding to the terms of the 1998 Agreement, and a court "cannot imply an obligation which would be inconsistent with the plain language of the contract." *Conley v. Wheeler-Watkins*

-11-

*Oil & Gas Co.*, 216 Ky. 494, 288 S.W. 350, 352 (1926). Thus, we cannot say that the trial court's decision to deny transportation fees was not supported by sufficient evidence.

### c. Sufficiency of the Evidence to Support the Court's Conclusion That Petro Trespassed By Plugging Well #K23

Appellants next argue that there was insufficient evidence to support the trial court's conclusion that Petro trespassed on Well #K23 when it unilaterally plugged such well. Specifically, Appellants argue in their brief that, under the 1998 Agreement, they were granted a thirty percent (30%) working interest in Well #K23, and thus "had a vested interest in the prudent operation" of the well.

Again, it is undisputed that the 1998 Agreement did not provide for Appellants to have the unilateral right to cap or plug Well #K23, and we decline to add such language to the contract. *Conley*, 216 Ky. 494, 288 S.W. at 352. Additionally, Well #K23 was not included in the trial court's August 30, 2004 order as one of the wells of which Petro was designated as operator. Thus, the trial court's conclusion was supported by sufficient evidence.

### d. Sufficiency of the Evidence to Support the Court's Conclusion That Appellants Did Not Have a Carried Working Interest

Appellants next make various arguments regarding whether Appellants had a carried working interest in the wells. Appellants argue that the 1996 Assignment provided them with a thirty percent (30%) "carried working

-12-

interest." However, as we have previously discussed, the trial court found the 1998 Agreement to be the controlling document between the parties, and such finding was supported by sufficient evidence. Moreover, as previously discussed, the plain language of the 1998 Agreement provided that Petro's interests were "working interests" and mentioned nothing regarding a "carried working interest" with respect to any of the parties. Appellants were well-versed in the business of gas exploration and production. Had the parties intended to include terms in the 1998 Agreement that had been included in the 1996 Assignment, they would have included such language. Thus, we take no issue with the sufficiency of the evidence in this regard.

### e. Sufficiency of the Evidence to Support the Court's Denial of Damages to Petro

Appellants' final argument is that the trial court erred in denying damages to Petro for the alleged negligent drilling and/or completion of the wells by Appellees. While Appellants clearly disagree with the trial court's decision and the weight and credibility assigned by the trial court to certain evidence, "a mere disagreement with the assessment of the evidence and the weight to be given thereto constitutes an insufficient basis upon which to reverse." *Sunrise Children's Servs., Inc. v. Kentucky Unemployment Ins. Comm'n*, 515 S.W.3d 186, 191 (Ky. App. 2016). Here, the trial court reviewed extensive factual and expert testimony

and evidence as well as voluminous documentary evidence.  Sufficient probative

evidence was presented to support the trial court's ruling as to this issue.

## **CONCLUSION**

For the foregoing reasons, we affirm the Clay Circuit Court's order.


ALL CONCUR.



BRIEFS FOR APPELLANTS:     BRIEF FOR APPELLEES:

John T. Aubrey                            Tommie L. Weatherly
Manchester, Kentucky              London, Kentucky