RENDERED: AUGUST 5, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0051-MR


MARY JANE DIEBOLD,
INDIVIDUALLY; MARY JANE
DIEBOLD, AS SUCCESSOR
ADMINISTRATIX OF THE ESTATE
OF THOMAS C. DIEBOLD; AND THE
ESTATE OF THOMAS C. DIEBOLD                    APPELLANTS



                  APPEAL FROM JEFFERSON CIRCUIT COURT
v.                HONORABLE ANNIE O'CONNELL, JUDGE
                      ACTION NO. 18-CI-003303



STEPHEN E. DIEBOLD                                    APPELLEE

AND



NO. 2020-CA-0723-MR

STEPHEN E. DIEBOLD                            CROSS-APPELLANT



            CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE ANNIE O'CONNELL, JUDGE
                ACTION NO. 18-CI-003303

MARY JANE DIEBOLD,
INDIVIDUALLY; MARY JANE
DIEBOLD, AS SUCCESSOR
ADMINISTRATIX OF THE ESTATE
OF THOMAS C. DIEBOLD; AND THE
ESTATE OF THOMAS C. DIEBOLD                    CROSS-APPELLEES


AND



NO. 2020-CA-1147-MR


STEPHEN E. DIEBOLD                                          APPELLANT



                  APPEAL FROM JEFFERSON CIRCUIT COURT
v.                HONORABLE ANNIE O'CONNELL, JUDGE
                        ACTION NO. 18-CI-003303



MARY JANE DIEBOLD,
INDIVIDUALLY; MARY JANE
DIEBOLD, AS SUCCESSOR
ADMINISTRATIX OF THE ESTATE
OF THOMAS C. DIEBOLD; AND THE
ESTATE OF THOMAS C. DIEBOLD                          APPELLEES




                                 OPINION
               AFFIRMING APPEAL NO. 2020-CA-0051-MR,
                 CROSS-APPEAL NO. 2020-CA-0723-MR,
                 AND APPEAL NO. 2020-CA-1147-MR
                        ** ** ** ** **


BEFORE:  LAMBERT, MCNEILL, AND TAYLOR, JUDGES.



                                  -2-

TAYLOR, JUDGE:  Mary Jane Diebold, as successor administratrix of the Estate of Thomas C. Diebold, the Estate of Thomas Diebold, (collectively referred to as the Estate), and Mary Jane Diebold, individually, bring Appeal No. 2020-CA-0051-MR from a December 20, 2019, Opinion and Order of the Jefferson Circuit Court.  Stephen E. Diebold brings Cross-Appeal No. 2020-CA-0723-MR also from the December 20, 2019, Opinion and Order and brings Appeal No. 2020-CA-1147-MR from a September 9, 2020, order of the Jefferson Circuit Court.  We affirm Appeal No. 2020-CA-0051-MR, Cross-Appeal No. 2020-CA-0723-MR, and Appeal No. 2020-CA-1147-MR.

The genesis of this case is found in a Members Agreement (hereinafter referred to as Buy-Sell Agreement) executed on March 22, 2005, between Stephen Diebold and Thomas Diebold and a Limited Liability Company Units Purchase Agreement (Purchase Agreement) subsequently executed on June 18, 2015, by Stephen, the Estate, and Thomas' widow, Mary Jane Diebold.

Relevant herein, Stephen and Thomas were members of two Kentucky limited liability companies – Wirecrafters, LLC, and Fabricated Metals, LLC.  The Buy-Sell Agreement provided that upon the death of Stephen or Thomas, the deceased member's estate would be required to sell the deceased's ownership interests (units) in both Wirecrafters and Fabricated Metals to the surviving

-3-

member.  The Buy-Sell Agreement included a formula for valuing the deceased members' ownership interests sold thereunder.

Thomas passed away on June 23, 2014.  To effectuate Stephen's purchase of Thomas's ownership interests in Wirecrafters and Fabricated Metals, Stephen, the Estate, and Thomas's widow, Mary, executed a Purchase Agreement on June 18, 2015.  The Purchase Agreement incorporated the formula in the Buy-Sell Agreement to value Thomas's ownership interests in Wirecrafters and Fabricated Metals.  The Purchase Agreement also contained a broad release of liability between the parties.

Thereafter, the Estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.  The Internal Revenue Service (IRS) audited the Estate and determined that the price Stephen paid for Thomas's ownership interests in Wirecrafters and Fabricated Metals was below fair market value.  As a result, the Estate and the IRS reached a settlement; wherein, $3.54 million was treated as a gift from Thomas to Stephen, resulting in an additional $1.4 million in taxes.  The Estate did not pay the additional taxes; however, it utilized an unused estate tax exemption totaling $1.4 million, which had the effect of reducing such exemption available to Mary.

On June 8, 2018, Stephen filed a Petition for Declaration of Rights against the Estate and Mary, individually.  Therein, Stephen alleged that the Estate

and Mary believed that he was liable for the difference between the fair market value of Thomas's ownership interests (units) in Wirecrafters and Fabricated Metals and the actual price he paid for same in the Purchase Agreement and/or for additional taxes assessed against the Estate. So, Stephen sought a declaration that the release set forth in the Purchase Agreement barred such claims by the Estate and Mary, the statute of limitations barred such claims, and if the Estate or Mary asserted any claims against Stephen, Stephen would be entitled to indemnification under the Purchase Agreement for breach thereof.

The Estate and Mary then filed a response to the petition and counterclaim. In the counterclaim the Estate and Mary alleged, in relevant part:

> 8. The Buy-Sell Agreement required that upon the death of either of the two members the surviving member was required to purchase the deceased member's units upon the terms as set forth in the Buy-Sell Agreement. Decedent and Defendant employed a formula for the pricing of the units.
>
> 9. The Buy-Sell Agreement provided for a three-year computed EBITDA [Earnings before interest, taxes, depreciation and amortization] with a 3.6 multiplier.
>
> 10. According to Steve Diebold, the formula used between Decedent and him was the "exact same formula used to value the businesses" when [Fabricated Metals] purchased Frank Diebold's units in 2002. Steve Diebold was a party to the Frank Diebold [Fabricated Metals] purchase agreement.

11.     Steve Diebold's statement that the formula used in the Buy-Sell Agreement was the same as that used to value [Fabricated Metals] in the decedent's buyout of Frank's units is incorrect.  The formula to determine the value of [Fabricated Metals] in Decedent's purchase of Frank's shares was a three-year average EBITDA with a multiplier of 3.7 and is in the range of the IRS's expert's multiplier valuation EBITDA.

. . . .

## REFORMATION BASED UPON MUTUAL MISTAKE

. . . .

21.     At the time Decedent [Thomas] and Steve Diebold entered into the Buy-Sell Agreement they mistakenly believed that the buyout of Frank's shares in [Fabricated Metals] used a three-year average EBITDA with a 3.6 multiplier.

22.     The intent of the Buy-Sell Agreement was, in part, to provide for a fair valuation of the Corporate LLC's units, including the sale and purchase of such units upon the death of one of the members, i.e., "to establish a fair value for each business" (Wirecrafters and [Fabricated Metals]) for the purchase of the deceased member's units by the surviving member.

23.     Pursuant to the Purchase Agreement, Counter-Petitioners received a sum for the sale of Decedent's units in Wirecrafters and [Fabricated Metals] to Counter-Respondent that was determined by the formula set forth in the Buy-Sell Agreement.

24.     The value of the Corporate LLC's and thus, the purchase price for the Decedent's units by Steve Diebold was the product of a mistake for which neither party is at fault.

25.     The sale of Decedent's units in the Corporate LLCs was based on this mistaken understanding, and therefore failed to accomplish the fair market value sale and purchase of units as intended by Tom Diebold and Steve Diebold when they entered into the Buy-Sell Agreement.

26.     Further, the sale was unfair, unreasonable, unconscionable, or not at fair market value as shown by the IRS's rejecting that the Buy-Sell Agreement and the Purchase Agreement were arm's length transactions and the IRS's disregard of the valuation formula for the purchase price.

. . . .

28.     The parties mutual mistake entitles Counter-Petitioners to have this Court rescind the Buy-Sell Agreement and/or reform the Purchase Agreement to reflect the Decedent's and Steve Diebold's actual agreement, intention and understanding, *i.e.*, to "establish a fair value of each business."

. . . .

## COUNT II

### RESCISSION BASED ON UNILATERAL MISTAKE

. . . .

32.     Alternatively, a unilateral mistake was made by Counter-Petitioners with respect to the Purchase Agreement in regards to the formula used to determine the fair market value of the Corporate LLC's. Counter-Petitioners did not detect the mistake despite the exercise of reasonable care and should not bear the responsibility for the mistake.

33.     Enforcement of the Purchase Agreement's purchase price in light of and after the IRS's audit and adjustments is unconscionable.  Moreover, Steve Diebold knew or should have known of the mistake.  Steve Diebold stated in his November 30, 2017[,] memorandum, "We agreed that the formula did not yield a top dollar price, but then again it was no bargain basement price either."

. . . .

36.     Counter-Petitioners are therefore entitled to rescission and/or reformation of the Purchase Agreement and reimbursement in full from Steve Diebold for the difference in the value of the Corporate LLC's as determined by the IRS, an amount equal to the additional taxes paid by the Estate due to the IRS's deeming the increased differential a gift to Steve Diebold and the diminished DSUE [Decedent's spouse unused estate tax exemption] available to M.J. [Mary] Diebold.

. . . .

## COUNT III

## CONSTRUCTIVE FRAUD

. . . .

39.     Tom Diebold and Steve Diebold were not only brothers but were long-time managers of the Corporate LLCs.  Steve Diebold was knowledgeable in the details of the Corporate LLCs operations and financial affairs.  Steve Diebold knew or should have known the valuation formula in the Buy-Sell Agreement was millions of dollars below the Frank Diebold buy-out valuation formula.

40.     Steve Diebold owed a duty of good faith and fair dealing to the Estate on the Purchase Agreement and

to advise the Estate that the consideration of Purchase Agreement was grossly below the formula used with the Frank Diebold buy-out.

41.     The differences in consideration between the Frank Diebold buy-out valuation formula and Purchase Agreement valuation was of such a magnitude that the Purchase Agreement is plainly unconscionable.

42.     Steve Diebold's failure to advise the Estate of the existence of the Frank Diebold buy-out valuation and its much larger EBDITA [sic] multiplier prior to the execution of the Purchase Agreement constitutes constructive fraud.

43.     This constructive fraud mandates rescission of the Purchase Agreement since Steve Diebold was in a position of trust and confidence to the Estate and M.J. [Mary] Diebold.

. . . .

## COUNT IV

## INDEMNIFICATION

. . . .

47.     The parties never intended for the sale of Decedent's units to Steve Diebold to be considered a gift. The IRS audit and tax adjustment on the Estate was post the Purchase Agreement and supersedes the purchase price set forth in the Purchase Agreement.  Such event was not contemplated by the Purchase Agreement and is outside of the release set forth in the Purchase Agreement.

48.     Counter-Petitioners are entitled to indemnity from Steve Diebold for the complete tax impact of this adjustment in an amount equal to the additional taxes

paid by the Estate due to the IRS's deeming the increased differential a gift to Steve Diebold and the diminished DSUE available to M.J. [Mary] Diebold.

Counterclaim at 6, 8-13 (citations omitted).

Stephen subsequently filed a motion for judgment upon the pleadings. Stephen argued that the Estate and Mary's claims were barred by the release contained in the Purchase Agreement and by the applicable statute of limitations. Stephen maintained:

> The parties declared their intention to enter into a broad release – one affecting all claims, whether known or unknown, suspected or claimed, presently discoverable or undiscoverable.
>
> . . . .
>
> The release at hand is as complete, explicit and unambiguous as a general release can be. The plain language of the Purchase Agreement therefore releases all of the claims set forth in Counter Petitioners' Counterclaims as a matter of law, and such claims should be dismissed with prejudice.

Motion for Judgment on Pleadings at 10-11. Stephen also argued that he owed no fiduciary duty to either the Estate or Mary; thus, their claim of constructive fraud must fail.

In their response, the Estate and Mary asserted that Stephen, as a managing member of Wirecrafters and Fabricated Metals, owed a fiduciary duty to the Estate, as the successor in interest to Thomas's ownership interest in

-10-

Wirecrafters and Fabricated Metals, and to Mary. The Estate and Mary claimed that Stephen knew or should have known that the formula used for valuation in the Buy/Sell Agreement and the Purchase Agreement was not intended by the parties and was included only by mistake. In particular, the Estate and Mary argued that Stephen "violated his fiduciary duty by remaining silent on a mistake . . . . A mistake Steve knew or should have known had occurred." Response to Motion for Summary Judgment on the Pleadings at 17-18. The Estate and Mary also sought to reform the Purchase Agreement due to mutual mistake concerning the formula utilized to value Thomas's ownership interest in Wirecrafters and Fabricated Metals. Alternatively, the Estate and Mary maintain that the Purchase Agreement should be rescinded for their unilateral mistake as to the valuation formula. Upon these claims, the Estate and Mary assert that material issues of fact existed that precluded a judgment on the pleadings.

By a December 20, 2019, Opinion and Order, the circuit court granted Stephen's motion for judgment on the pleadings and dismissed the Estate and Mary's counterclaim. Therein, the circuit court determined that Stephen owed no fiduciary duty to Mary and that the release found in the Purchase Agreement barred the Estate and Mary's counterclaims against Stephen. The Opinion and Order included complete finality recitations per Kentucky Rules of Civil Procedure (CR) 54.02.

-11-

On January 2, 2020, Stephen filed a motion for an award of attorney's fees and costs pursuant to Section 9.2 of the Purchase Agreement; Stephen had also asserted this claim in the Petition for Declaration of Rights. In the motion, Stephen argued that the Estate and Mary breached the Purchase Agreement by bringing the counterclaims, thus entitling Stephen to attorney's fees and costs per Section 9.2 of the Purchase Agreement.

A few days later, on January 9, 2020, the Estate and Mary filed a notice of appeal (Appeal No. 2020-CA-0051-MR) in the Court of Appeals from the December 20, 2019, Opinion and Order. Stephen then filed a motion to dismiss the appeal arguing that the December 20, 2019, Opinion and Order was not final and appealable. Stephen argued that the circuit court did not decide his claim of indemnification under Section 9.2 of the Purchase Agreement. Therefore, Stephen believed that the December 20, 2019, Opinion and Order was interlocutory.

While the motion to dismiss was pending in the Court of Appeals, the circuit court rendered an Order Holding Motion in Abeyance. Therein, the circuit court decided to hold the case in abeyance until the Court of Appeals ruled on the motion to dismiss Appeal No. 2020-CA-0051-MR.

By order entered May 20, 2020, the Court of Appeals denied Stephen's motion to dismiss. Thereafter, on May 28, 2020, Stephen filed a cross-

appeal (Cross-Appeal No. 2020-CA-0723-MR) from the December 20, 2019, Opinion and Order and from the March 13, 2020, Order.

Eventually, on September 9, 2020, the circuit court rendered an Order Denying Motion for Attorney's Fees and Costs. The circuit court noted that the case "is now on appeal at the Kentucky Court of Appeals" and that the court "no longer has jurisdiction over this matter." Stephen then filed a Notice of Appeal (Appeal No. 2020-CA-1147-MR) from the September 9, 2020, Order.

These appeals were consolidated for review by order of this Court. We will initially address Appeal No. 2020-CA-0057-MR and then jointly consider Cross-Appeal No. 2020-CA-0723-MR and Appeal No. 2020-CA-1147-MR.

To begin, the December 20, 2019, Opinion and Order appealed from clearly granted Stephen's motion for judgment on the pleadings. Pursuant to CR 12.03, the circuit court shall consider the motion as a motion for summary judgment if "matters outside the pleading[s] are presented to and not excluded by the court[.]" In this case, the record clearly reveals that matters outside the pleadings were presented to the circuit court. As a result, we shall analyze the December 20, 2019, Opinion and Order as a summary judgment.

Summary judgment is proper where there exists no genuine issue of material fact and movant is entitled to judgment as a matter of law. CR 56.03; *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991). All

-13-

facts and inferences therefrom are to be viewed in a light most favorable to the nonmoving party. *Steelvest*, 807 S.W.2d 476. If there are no genuine issues of material fact, our review of the judgment looks only to questions of law, whereupon our review proceeds *de novo*. *Brown v. Griffin*, 505 S.W.3d 777, 781 (Ky. App. 2016). Our review proceeds accordingly.

Appeal No. 2020-CA-0051-MR

The Estate and Mary contend that the circuit court erred by concluding that the release in the Purchase Agreement barred their claims against Stephen for reformation/recession of the Purchase Agreement and indemnification. Initially, the Estate and Mary assert that Stephen, as a managing member, owed a fiduciary duty to the Estate, and he breached this duty by failing to disclose that the valuation formula in the Purchase Agreement was included as the result of a mistake, which resulted in Thomas's ownership interests being valued below fair market value. Upon the basis of such constructive fraud allegedly committed by Stephen, the Estate and Mary maintain that the release in the Purchase Agreement is invalid and unenforceable.

In *Patmon v. Hobbs*, 280 S.W.3d 589, 594-95 (Ky. App. 2009), our Court recognized that a managing member of a limited liability company (LLC) owed a fiduciary duty to other members and to the company in certain circumstances. *Id.* As in *Hobbs*, 280 S.W.3d 589, such a fiduciary duty usually

-14-

arises in situations directly involving the LLC. Particularly, in *Hobbs*, 280 S.W.3d at 593, the managing member diverted a business opportunity and funds from the LLC to another company. By contrast, the Estate and Mary claim that Stephen breached his fiduciary duty in relation to the Purchase Agreement, in which one member purchased the ownership interest of another member. So, the facts of this case and the facts presented in *Hobbs*, 280 S.W.3d 593, are fairly divergent. Upon the whole, it is unclear whether Stephen owes a fiduciary duty to the Estate under these unique circumstances; in fact, we harbor grave doubt that he does. Nonetheless, even if Stephen did owe such a fiduciary duty, there are no genuine issues of material fact as to whether he breached same.

As to Stephen's fiduciary duty, the Estate and Mary argue that Stephen breached this duty by failing to disclose that a mistake occurred as to the valuation formula utilized in the Purchase Agreement. They claim that the valuation formula in the Purchase Agreement and the Buy-Sell Agreement was not the same formula previously utilized for a buyout of Frank Diebold's ownership interests in Fabricated Metals, although the parties intended the valuation formulas to be identical.

The record contains a memorandum signed by Stephen on November 30, 2017, and drafted in response to the tax audit of the Estate. Therein, Stephen recounted that the valuation formula utilized by the parties was the same formula

previously utilized for a buyout of Frank Diebold in Fabricated Metals. Therefore, according to the memorandum, Stephen was unaware that the valuation formula utilized in the Purchase Agreement and the Buy-Sell Agreement differed from the previous formula used to purchase Frank's ownership interest. And, viewing the record most favorable to the Estate and Mary, they have simply failed to set forth any facts that Stephen knew or should have known of the purported "mistake" as to the valuation formula. Consequently, we hold that no material issue of fact exists as to whether Thomas breached a fiduciary duty to the Estate or to Mary. As a result, no constructive fraud took place, and the release in the Purchase Agreement is valid.

The Estate and Mary also assert that their claims (mutual mistake, unilateral mistake, and indemnification) do not come within the ambit of the release contained in the Purchase Agreement. We disagree.

In the Purchase Agreement, the release read:

> **6.1. Release of Buyer and Companies.** Except for the covenants and obligations under this Agreement, each of Seller, for itself, and Mary Jane Diebold, for herself, and their respective affiliates, members, successors and assigns, and for all other persons or entities claiming by, or through or under Seller, hereby fully and forever remises, releases, acquits and discharges each of the Companies and Buyer and their respective managers, members, directors, officers, employees, agents, representatives, heirs, successors and assigns (each a "Released Party" and collectively, the "Released Parties"), and each of them, of and from any

and all manner of actions, causes of action, suits, sums of money, accounts, reckonings, covenants, controversies, agreements, promises, damages, judgments, proceedings, executions, debts, obligations, liabilities, liens, security interests, claims and demands of any nature whatsoever, whether at law, in equity or otherwise, whether in tort, contract or otherwise, whether pursuant to any statute, ordinance, regulation, rule of common law or otherwise, whether direct or indirect, whether punitive or compensatory, whether known or unknown, whether presently discoverable or undiscoverable, whether suspected or claimed, and whether fixed, contingent or otherwise, which Seller or Mary Jane Diebold ever had, now has or may have against any Released Party, based in whole or in part on any contract, agreement, arrangement, commitment, loan, advance, offer, facts, conduct, activities, omissions, transactions, events or circumstances, whether known or unknown, which may now exist or which may have existed, occurred, happened, arisen or transpired at any time prior to or on the date hereof.

Purchase Agreement at 5.

It is said that "a release is a discharge of a claim or obligation and surrender of a claimant's right to prosecute a cause of action." *Frear v. P.T.A. Idus., Inc.*, 103 S.W.3d 99, 107 (Ky. 2003). Stated differently, a release constitutes a "private agreement amongst parties which gives up or abandons a claim or right." *Id*. As a release is a contract, it "will be strictly enforced according to its terms absent ambiguity." *Grass v. Akins*, 368 S.W.3d 150, 153 (Ky. App. 2012). And, the interpretation of a contract presents an issue of law for the court. *Frear*, 103 S.W.3d at 105.

The terms of the above release are unambiguous and broad. Thereunder, the Estate and Mary released all known or unknown claims, causes of action, covenants, liability, and demands against Stephen based upon contract, agreement, conduct, omission, or transaction that existed or may have existed prior to or at the time of the Purchase Agreement. This broad release plainly includes the Estate and Mary's claims of mutual/unilateral mistake and indemnification for the additional gift tax incurred by the Estate. Therefore, we conclude that the Estate and Mary's claims against Stephen are barred by the release contained in the Purchase Agreement.

We deem any other contentions of error to be moot or without merit.

In sum, we are of the opinion that the circuit court properly dismissed the Estate and Mary's claims against Stephen.

Cross-Appeal No. 2020-CA-0723-MR
and Appeal No. 2020-CA-1147-MR

Stephen argues that the circuit court's December 20, 2019, Opinion and Order was not final and appealable.[1] Stephen maintains that the December 20, 2019, Opinion and Order was inherently interlocutory because his claim for indemnification under Section 9.2 of the Purchase Agreement had not been adjudicated. Stephen believes that his indemnification claim for attorney's fees

---

[1] By order entered May 20, 2020, we note that the Court of Appeals denied Stephen E. Diebold's motion to dismiss Appeal No. 2020-CA-0051-MR as interlocutory.

-18-

and costs was an "integral part of the claims adjudicated." Stephen's Reply Brief at 2. In support of his argument Stephen cites to *Francis v. Crounse Corporation*, 98 S.W.3d 62 (Ky. App. 2002).

A final and appealable judgment is one that adjudicates all the rights of all the parties or is made final under CR 54.02. CR 54.01. In an action involving multiple claims and/or multiple parties, CR 54.02 permits the trial court to make an otherwise interlocutory order final and appealable in certain circumstances. Under CR 54.02, an interlocutory order may only be made final and appealable if the order includes both recitations – (1) there is no just cause for delay (2) the decision is final. However, CR 54.02 will not convert an inherently interlocutory order into a final and appealable. *Hale v. Deaton*, 528 S.W.2d 719, 722 (Ky. 1975).

Although Stephen cites to *Francis*, 98 S.W.3d 62, to support his contention that the December 20, 2019, Opinion and Order is inherently interlocutory, we view *Francis* as inapposite. In *Francis*, 98 S.W.3d 62, the Court of Appeals determined if attorney's fees were an element or part of a claim, a judgment resolving such claim without determining attorney's fees constituted an innately interlocutory judgment.

Conversely, in this case, Stephen seeks attorney's fees under his claim for indemnification per the Purchase Agreement. This indemnification claim has

not been adjudicated by the circuit court. Rather, the December 20, 2019, Opinion and Order fully adjudicated the Estate and Mary's claims against Stephen and included complete finality recitations per CR 54.02. Thus, *Francis*, 98 S.W.3d 62, has no application to this case, and the December 20, 2019, Opinion and Order is final and appealable. As we have resolved the parties' appeals, the circuit court may now reach the merits of Stephen's indemnification claim for attorney's fees and costs under the Purchase Agreement.

We view any remaining contentions of error as moot or without merit.

For the foregoing reasons, we affirm Appeal No. 2020-CA-0051-MR, Cross-Appeal No. 2020-CA-0723-MR, and Appeal No. 2020-CA-1147-MR.

ALL CONCUR.

| BRIEFS FOR APPELLANTS/CROSS-APPELLEES: | BRIEFS FOR APPELLEE/CROSS-APPELLANT: |
|---|---|
| | Janet P. Jakubowicz |
| Charles G. Middleton III | Brent R. Baughman |
| Louisville, Kentucky | Benjamin J. Lewis |
| | Aaron W. Marcus |
| | Louisville, Kentucky |